# IN THE SUPREME COURT OF IOWA

No. 74 / 05-1965

Filed September 28, 2007

**IN THE MATTER OF THE ESTATE OF
ROY N. JOHNSON**, Deceased,

**WILLIAM H. JOHNSON,** Executor of the
Estate of EMOGENE F. JOHNSON,

　　　Appellant.

---

Appeal from the Iowa District Court for Dallas County, William H. Joy, Judge.

Executor of surviving joint tenant's estate appeals an adverse ruling finding property held in joint tenancy was severed. **REVERSED AND REMANDED.**

Thomas P. Lenihan, West Des Moines, for appellant.

John E. Casper of Flander, Casper & Rosien, P.C., Winterset, for appellee Beverly Johnson Algoe, as executor for Roy N. Johnson's estate.

Jerrold B. Oliver of Jordan, Oliver & Walters, P.C., Winterset, for appellee individually.

**CADY, Justice.**

The right of survivorship makes joint tenancies a popular form of property ownership. Yet, the concomitant right of each joint tenant to destroy the joint tenancy, and thus the right of survivorship, is not always popular, particularly for the surviving joint tenant. As Hamlet observed in a different context, "ay, there's the rub"[1] and, in this case, the seeds of the issue presented. A district court decision found a joint tenant successfully exercised his right to destroy the right of survivorship prior to his death, and the surviving joint tenant appeals. We agree with the surviving joint tenant, now the executor of the surviving joint tenant's estate, and find the property remained in joint tenancy until the death of the joint tenant, at which time full title vested in the survivor. We reverse the district court's decision and remand.

## I. Background Facts and Proceedings.

Roy and Emogene Johnson purchased a home in Van Meter, Iowa, in 1963. They were married and took title to the home as joint tenants with the right of survivorship. They continued to live in their Van Meter home for over thirty-five years, where they raised a family and established the property as their homestead. *See* Iowa Code § 561.1 (2007) (defining homestead).

In the fall of 1998 Emogene suffered a severe stroke. The prognosis for her recovery was bleak, and she required intensive medical attention. Roy and the children felt Emogene would not live long, and they assumed Roy would survive her. Because of these circumstances,

---

[1]William Shakespeare, *Hamlet* act 3, sc. 1, line 64.

the family decided Emogene should transfer title in her automobile to Roy, as well as her interest in the homestead.[2]

On November 24, 1998, Emogene purportedly executed a power of attorney in her hospital room. This document designated her daughters, Janice Johnson and Beverly Johnson Algoe, as attorneys-in-fact. The power of attorney authorized Janice and Beverly to sell Emogene's property, but not her homestead.[3] On December 21, 1998, Janice and Beverly transferred the title for Emogene's car to Roy.

On that same day a quitclaim deed was drafted to convey Emogene and Roy's interest in their homestead solely to Roy. The deed stated "ROY N. JOHNSON and EMOGENE F. JOHNSON, husband and wife[,] do hereby Quit Claim to ROY N. JOHNSON all our right, title, interest, estate, claim and demand in the [homestead]." Roy signed the deed on December 21, and his signature was notarized. Emogene (or an agent for her), however, did not sign the deed that day, perhaps because the power of attorney did not authorize Emogene's agents to sell or encumber the homestead.

On January 4, 1999, Emogene purportedly executed another power of attorney. This power of attorney specified the legal description of the homestead and authorized Janice to convey or encumber Emogene's interest in the homestead. Then on January 6, 1999, Janice signed the

---

[2]The record suggests the family made these decisions to help Emogene qualify for Medicaid, although the decisions were likely based on erroneous assumptions.

[3]The power of attorney contained the typical boilerplate language, "This includes the right to convey or encumber my homestead legally described as follows," but it did not include the legal description of the homestead. Thus, it did not allow the agents to sell the homestead. Recent legislation, however, has deleted the requirement that "the instrument or power of attorney set[] out the legal description of the homestead." 2007 Iowa Legis. Serv. 221 (West).

quitclaim deed on behalf of Emogene, as indicated by the notary's seal. The deed was recorded the same day.

The earlier assumptions made by the family that gave rise to the transfers of property were proven wrong when Roy suddenly passed away on December 17, 1999, survived by his ailing wife Emogene and the three children, Janice, Beverly, and William. Roy left a will that gave all of his property to his three children in equal shares, although he did not specifically disinherit Emogene. Janice was named executor of Roy's estate in his will, but Beverly took her place after Janice's death in June of 2004.

Beverly filed the final report in Roy's estate in June of 2005. Emogene remained the surviving spouse and elected to take against the will. She also objected to the final report filed by Beverly. Emogene claimed the transfers of her car and her interest in the homestead were illegal because she was incompetent when the powers of attorney were executed.

The district court found Emogene was clearly incompetent at the time she signed the powers of attorney, which invalidated the transfer of her interest in the property to Roy under the deed. Nevertheless, the court held Roy unilaterally terminated the joint tenancy in the homestead by his act of conveying his interest to himself in fee simple because the deed constituted an expression of his intent to destroy the joint tenancy. The court further held that Emogene's statutory homestead rights to the property did not prevent Roy from destroying the joint tenancy because the effect of Roy's self-conveyance of his interest only created a tenancy in common, which meant Emogene still maintained her homestead rights to possess the property.

As a result, the district court concluded title to the homestead was split between Emogene and Roy's estate as tenants in common in "undivided one-half" shares.[4] It also held Roy's estate was to pay $1200 to Emogene for the proceeds from the sale of Emogene's automobile. Emogene appealed the district court ruling concerning the title to the homestead.

Emogene died in March of 2007, during the pendency of this appeal. As a result, Emogene's son and executor of her estate, William Johnson, is the named appellant.

## II. Issue & Standard of Review.

The question presented is whether the joint tenancy in the parties' homestead was severed under the circumstances of this case. The parties agree that because this is an equitable proceeding our review is de novo. *See In re Roehlke's Estate*, 231 N.W.2d 26, 27 (Iowa 1975) (citing Iowa Code § 633.33 (1975); *In re Estate of Cory*, 184 N.W.2d 693, 696–97 (Iowa 1971)). We give deference to the factual findings of the court but are not bound by them. *Id.* Of course, under a de novo review we will make our own legal conclusions, as we are not bound by and give no deference to the trial court's conclusions of law. *Rouse v. Union Twp.*, 530 N.W.2d 714, 716 (Iowa 1995).

---

[4]It is admittedly a paradox, and perhaps an oxymoron, to state property could be divided in undivided one-half shares or interests. But it is consistently referred to in this manner, and the reason for doing so is that the individual tenants are entitled to possess the whole of the property while they remain co-tenants (therefore their possession is undivided), but should they choose to alienate the property, they only have a proportional interest (which could be a one-half interest depending on the circumstances) to alienate. *See, e.g., In re Estate of Lamoureux*, 412 N.W.2d 628, 629 (Iowa 1987) (referring to the interests of joint tenants); *In re Allen's Estate*, 239 N.W.2d 163, 166 (Iowa 1976) (referring to the interests of tenants in common).

**III. Determining the Existence of Joint Tenancies in Iowa.**

Traditionally, questions concerning the existence of joint tenancies were answered by resorting to the "four unities" of interest, title, time, and possession. *See, e.g.,* 48A C.J.S. *Joint Tenancy* § 8, at 240 (2004) ("[I]n order that a joint tenancy may exist, there must coexist four unities: unity of interest, unity of title, unity of time, and unity of possession."). To create a joint tenancy the four unities had to be present—"[t]hat is, one and the same interest arising by the same conveyance, commencing at the same time and held by the one and the same undivided possession." *Switzer v. Pratt*, 237 Iowa 788, 791, 23 N.W.2d 837, 839 (1946). To sever or terminate[5] a joint tenancy, a joint

---

[5]Unfortunately, the words "sever" and "terminate" often appear side by side without any attempt to distinguish them. *See, e.g.*, 20 Am. Jur. 2d *Cotenancy & Joint Ownership* § 22, at 150–52 (2005) (discussing "Severance and Termination" without distinguishing between the two). It inevitably gives rise to the question of whether the terms are interchangeable or have different meanings. The case law and commentary are less than clear on this point, but it is evident the terms are not perfectly synonymous.

Black's Law Dictionary defines "severance" as "[t]he termination of a joint tenancy, usu[ally] by converting it into a tenancy in common." *Black's Law Dictionary* 1406 (8th ed. 2004). A court has defined severance as the "separation of the interests of the joint tenants, a vesting of the interest of one, separated from the interest of the other, in some third person." *Tindall v. Yeats*, 64 N.E.2d 903, 906 (Ill. 1946). At least one commentator has recognized what a severance is not. *See* Frank A. Reichelderfer, *Severance of Joint Interests*, 1959 Ill. L. Forum 932, 932 ("It has been said that any type of destruction of a unity is a severance. However, . . . [j]oint interests may be terminated other than by severance. All joint interests may, for example, convey their entire interests to a third party. This certainly terminates their joint relationship but is not a severance."). Termination, on the other hand, is not usually defined, which can give rise to the belief that any destruction of a joint tenancy that is not a severance must be a termination, or that a severance is a special kind of termination.

This case highlights the need for clear terminology: the deed originally attempted to destroy the joint tenancy in favor of sole ownership in one party, and now one of the joint tenants alleges the attempted conveyance by deed operated to destroy the joint tenancy in favor of a tenancy in common among the former joint tenants. If either attempt prevailed, the joint tenancy would be destroyed, but the resulting ownership would be different in both how the property is held and by whom.

While we acknowledge the two terms are not synonymous, we make no attempt to define the terms any further than describing the latter case as a severance, and the

tenant simply had to destroy one of the unities. *See Stuehm v. Mikulski*, 297 N.W. 595, 597 (Neb. 1941) ("The four unities heretofore listed must not only come into being with the creation of such an estate, but must also continue to exist while the estate exists, and the destruction of any one of them as to all holders will destroy the estate . . . .").

This common-law approach to the existence of joint tenancies began losing steam over fifty years ago. *See* R.H. Helmholz, *Realism & Formalism in the Severance of Joint Tenancies*, 77 Neb. L. Rev. 1, 1–2 (1998) [hereinafter Helmholz, *Severance of Joint Tenancies*]. Critics derided the approach as too formalistic, and declared it to be outdated. *See* Paul Basye, *Joint Tenancy: A Reappraisal*, 30 Cal. St. B.J. 504, 507 (1955) (describing the four unities as "an outstanding example of persisting medieval formalism"); Robert W. Swenson & Ronan E. Degnan, *Severance of Joint Tenancies*, 38 Minn. L. Rev. 466, 503 (1954) (describing the four unities as "useless concepts today"). Moreover, critics recognized the four unities often worked, typically in conjunction with the common-law rule that a grantor could not also be a grantee, *see Riddle v. Harmon*, 162 Cal. Rptr. 530, 531–34 (Cal. Ct. App. 1980) (recognizing how the four unities operate in conjunction with the "two-to-transfer" rule, and refusing to "adher[e] to [these] cumbersome feudal law requirements"), to "frustrate the legitimate expectations of too many joint tenants [or would-be joint tenants], and for no discernable purpose," Helmholz, *Severance of Joint Tenancies*, 77 Neb. L. Rev. at 2.

As a result, courts began adopting an alternative intent-based approach to determine the existence of joint tenancies. *Id.* at 9. We

---

former as a termination. Clearer definitions would be preferable, as the law regarding "severance and termination" may differ depending on the object to be accomplished.

recognized this approach many years ago and have gravitated towards it since that time. *See, e.g., In re Baker's Estate*, 247 Iowa 1380, 1384, 78 N.W.2d 863, 865 (1956) (noting cases in which we primarily relied on the intention of the parties rather than the four unities to determine the existence of a joint tenancy). Today, the approach generally enjoys favorable acceptance among other courts and scholars as the more appropriate and realistic means for determining the existence of joint tenancies. *See Taylor v. Canterbury*, 92 P.3d 961, 966 (Colo. 2004) ("Thus, in determining whether a joint tenancy has been created or severed, we look not to the four unities, but rather to the intent of the parties."); *Nicholas v. Nicholas*, 83 P.3d 214, 225 (Kan. 2004) (recognizing "the modern trend of looking to the parties' intent as the operative test of whether a joint tenancy has been severed rather than depending upon the traditional doctrine of the four unities"); *In re Estate of Knickerbocker*, 912 P.2d 969, 975 (Utah 1996) ("There is substantial support for the concept that it is the intent of the parties, not the destruction of one of the four unities, that should govern."); Helmholz, *Severance of Joint Tenancies*, 77 Neb. L. Rev. at 9 ("A survey of the decisions on the subject during the past forty years . . . leaves one with the distinct sense of the traditional approach's substantive irrelevance.").

While we have not formally and expressly adopted the intent-based approach, we do so today. Our review of the case law and commentary confirms our position that strict reliance on the four unities is not the proper test for determining the existence of joint tenancies in Iowa. Instead, the intent of the parties should prevail when possible. *See In re Estate of Bates*, 492 N.W.2d 704, 706 (Iowa Ct. App. 1992) (stating "Iowa does not follow the 'four unities' common law rule," because "[i]n Iowa

the intent of the parties prevails"). In addition, we see no reason to distinguish our approach based on whether the joint tenancy is sought to be created, severed, or terminated. *But see Hyland v. Standiford*, 253 Iowa 294, 299, 111 N.W.2d 260, 264 (1961) ("The common law unities of interest, title, time and possession necessary for the *creation or determination* of joint tenancies have lost their importance. There has been no comparable diminution of importance in questions of *termination or severance*." (Emphasis added.)). The modern case law clearly suggests uniformity under an intent-based approach. *See, e.g., Chrystyan v. Feinberg*, 510 N.E.2d 33, 36 (Ill. App. Ct. 1987) ("Severance should not be governed more strictly than the creation of joint tenancies.").

Although an intent-based test is the best and more realistic approach, we recognize it is not without its own difficulties, as this case illustrates. When and under what circumstances a joint tenancy can be created, severed, or terminated remains a subject of great debate, and we must enter this discourse to consider the extent to which the intent-based analysis may alter the resolution of these questions provided under the common law. *See* Helmholz, *Severance of Joint Tenancies*, 77 Neb. L. Rev. at 24. Indeed, abandonment of the theoretical litmus test provided by the four unities may sacrifice some of the clarity it presumably provided.[6] Clarity in the law is necessary, but we see no

---

[6]The four unities were not a litmus test in practice. *See* John Mann, *Joint Tenancies Today*, 1956 Ill. L. Forum 48, 75 ("[T]he joint tenancy is in truth one of our most technical estates, capable of producing problems sufficient to challenge the ingenuity of even the trained and experienced attorney."); George W. Marti, *Real Property—Joint Tenancy—Effect of Contract to Convey by Joint Tenants of Entire Interest in Property as a Severance of the Joint Tenancy*, 55 Mich. L. Rev. 1194, 1196 (1957) (criticizing the result in *Baker's Estate*, 247 Iowa at 1380, 78 N.W.2d at 863, under a four unities analysis). Nevertheless, in theory the common-law approach under the four unities provides a bright line test for the determination of joint tenancies.

reason why it cannot be achieved under an intent-based approach when proper attention is paid to the individual facts and circumstances of each case. Yet, this goal also requires us to properly frame the intent-based concept, something we have not fully accomplished in the past.

In drawing the contours of the intent-based test, it is important to recognize this approach does not simply permit a court to determine the intent of a party under the facts and then fulfill it.[7] *See Nicholas*, 83 P.3d at 225 ("[I]ntent alone will not sever the joint tenancy. Sheryl's intent is irrelevant if he took no effective action."). In fact, we know of no court that has ever held intent alone is enough to determine the existence of a joint tenancy.[8] Instead, it seems fundamental that intent must be derived from an instrument effectuating the intent to sever the joint tenancy. Thus, we begin with the premise that intent unaccompanied by some action or instrument sufficient to corroborate and give effect to that intent will not create, sever, or terminate a joint tenancy. This approach, of course, leads us back to the district court holding that derived intent to sever from a deed characterized as a self-conveyance of one joint tenant.

---

[7]The "intent of the parties" typically refers to the intent of the joint tenants—i.e., whether the alleged joint tenants intended to create a joint tenancy or if the actual joint tenants intended to sever or terminate the joint tenancy. *See, e.g., Baker's Estate*, 247 Iowa at 1385–88, 78 N.W.2d at 866–68 (discussing the creation and severance of joint tenancies, and examining the intent of the joint tenants). However, in cases of unilateral action, the "intent of the parties" really refers to just one joint tenant. *See, e.g., Keokuk Sav. Bank & Trust Co. v. Desvaux*, 259 Iowa 387, 392, 143 N.W.2d 296, 299 (1966) (recognizing a joint tenant may unilaterally sever a joint tenancy). Thus, in cases of unilateral severance, the question would be what the singular joint tenant's, or party's, intent was, rather than the parties' intent.

[8]It appears from our review of the case law the closest a court came to relying solely on the party's intent was in *Hendrickson v. Minneapolis Fed. Sav. & Loan Ass'n*, 161 N.W.2d 688 (Minn. 1968); but even in *Hendrickson*, the tenant's intent was accompanied by a "duly . . . executed Declaration of Election to Sever Survivorship of Joint Tenancy." 161 N.W.2d at 689.

### IV. Was the Joint Tenancy Severed in this Case?

The surrounding circumstances in this case inevitably point to a void deed. Under the common law, a void deed could not work a severance, but only because a failed conveyance could not disturb the original unities of time, title, interest and possession. *See* Helmholz, *Severance of Joint Tenancies*, 77 Neb. L. Rev. at 9 (recognizing that in cases of void deeds the conclusion that there is no severance "follows as a matter of course" under the common law). Of course, we must decide if this same result occurs under an intent-based approach.

Emogene's incompetence rendered the conveyance of her interest invalid. *See* 23 Am. Jur. 2d *Deeds* § 23, at 89–90 (2d ed. 2002) ("A competent grantor is essential for a proper deed."). Additionally, the homestead nature of the property rendered the conveyance of Roy's interest invalid because Emogene did not provide her competent approval.[9] Normally, Emogene's incompetence would not prohibit Roy from conveying his own property interest held in joint tenancy with her. However, the interest of a spouse in homestead property is protected by statute. Iowa Code section 561.13 provides "[a] conveyance . . . of . . . the homestead, if the owner is married, is not valid, unless and until the spouse of the owner executes the same or a like instrument, or a power

---

[9]Of course, under the common law the conveyance of Roy's interest to himself would be invalid because it would violate the "two-to-transfer" rule. *See Riddle*, 162 Cal. Rptr. at 533. Iowa has, like most states, largely abandoned the common-law rule that prohibited conveyances between one person as grantor and grantee. *See Fay v. Smiley*, 201 Iowa 1290, 1297, 207 N.W. 369, 372 (1926) ("It is urged herein that one cannot be grantor and grantee in the same deed, and therefore the conveyance to himself amounts to nothing, and the other grantee in the deed takes the whole title. With this contention we do not agree."); *Switzer*, 237 Iowa at 790–92, 23 N.W.2d at 839–40 (permitting a husband to deed his own land to himself and his wife as joint tenants). There is no doubt courts have recently permitted such a conveyance even when the grantor was the sole grantee. *See Taylor*, 92 P.3d at 967; *Knickerbocker*, 912 P.2d at 975.

of attorney for the execution of the same or a like instrument." Iowa Code § 561.13 (2005). Roy was clearly attempting to convey the homestead, albeit his own interest to himself. Thus, the plain language of the statute prohibited Roy from doing so unless Emogene joined in the pursuit pursuant to the statute. The deed was totally void.

Notwithstanding, Roy's estate argues, as the district court held, a deed that is void or ineffective as a conveyance may nevertheless remain a viable source of intent to sever a joint tenancy with a spouse in homestead property because mere severance of the joint tenancy in homestead property only creates a tenancy in common and does not jeopardize or destroy the statutory homestead rights of the spouse. Instead, severance would only change the form of ownership without compromising the spouse's right of possession provided under the homestead statute. Roy's estate claims the application of the intent-based test in this manner is consistent with the proposition we recognized over a century ago that a spouse may unilaterally contract with another person for a right-of-way across homestead property without the consent of the other spouse because the right-of-way is not "a destruction of the homestead, [n]or [did it] defeat[] its occupancy as such." *Ottumwa, Cedar Falls & St. Paul Ry. v. McWilliams*, 71 Iowa 164, 169, 32 N.W. 315, 318 (1887). We reject this application of the intent-based test for two core reasons.

First, it is obvious that Roy's intent under the deed in this case was to take sole title to the homestead, and the joint tenancy would have been destroyed, not severed, as a consequence of that intent. Under an intent-based test, it is fundamental that the underlying instrument must effectuate the intent to sever. At least one other court has found this

distinction significant. *See Hayes v. Lewis*, 338 N.E.2d 102, 105 (Ill. Ct. App. 1975) ("The purpose of this attempt on behalf of defendant was not to sever the joint tenancy relationship so as to make the parties tenants in common. It was rather an attempt to eliminate entirely any interest on the part of plaintiff by vesting the entire ownership of the stock in defendant."); *see also Nelson v. Albrechtson*, 287 N.W.2d 811, 817 (Wis. 1980) ("Joint tenants do have the right to sell their individual interest and thereby sever the joint tenancy. However, it is clear here that no such partial sale was contemplated." (Citation omitted.)). We conclude it would be inappropriate to utilize an intent-based approach to achieve a result the parties never intended.[10] As a result, Roy's lack of intent to sever the joint tenancy to create a tenancy in common with Emogene makes it unnecessary for us in this case to decide whether a spouse can unilaterally sever a joint tenancy in homestead property by means of a proper self-conveyance. *See Taylor*, 92 P.3d at 967 (permitting a unilateral severance by self-conveyance); *Knickerbocker*, 912 P.2d at 976 (same).[11] The deed relied upon to supply intent did not express an intent to sever the joint tenancy.

---

[10]We recognize a joint tenancy may be severed even when the joint tenant did not intend to create a tenancy in common. Such a result, however, is usually the inescapable conclusion of involuntary conveyances, seizures, or severances under the law. *See In re Estate of Thomann*, 649 N.W.2d 1, 7 (Iowa 2002) ("[W]e think the legislature must have intended that one joint tenant's murder of the other joint tenant severs the joint tenancy and creates a tenancy in common."); *Frederick v. Shorman*, 259 Iowa 1050, 1059–60, 147 N.W.2d 478, 484 (1966) (recognizing a joint tenancy may be involuntarily severed). It seems to us that in a voluntary situation such as this, when a joint tenant's intent is not to create a tenancy in common, but to obtain sole legal title, such intent is not a basis for severing the joint tenancy under a void deed.

[11]The district court found Emogene's incompetence only voided her transfer of her interest to Roy under the deed, yet the deed remained valid as a transfer by Roy of his interest to himself, which had the effect of severing the joint tenancy and creating a tenancy in common. The district court further found that the homestead statute did not stand as an impediment to the unilateral severance by Roy of the joint tenancy in homestead property because the severance of the joint tenancy by self-conveyance

Secondly, we are convinced an intent to sever a joint tenancy under the intent-based test must normally, if not in every instance, be derived from an instrument that is legally effective to carry out the intent. While we have always recognized a conveyance will sever or terminate a joint tenancy, *see Baker's Estate*, 247 Iowa at 1385, 78 N.W.2d at 866, we have never recognized an invalid conveyance, i.e., a void deed, will do so. A relatively recent law review article stated that, even under an intent-based approach when the joint tenant's intent is clear, if the deed is void, "[t]he law has long been, and still is, that there is no severance." Helmholz, *Severance of Joint Tenancies*, 77 Neb. L. Rev. at 27–28. We find ample support for this statement from other jurisdictions. *See Chrystyan*, 510 N.E.2d at 36 (holding an invalid deed could not be used to establish intent to sever because the intent was not exercised in a way consistent with the law); *McBee v. Crosby*, 632 P.2d 1059, 1061 (Colo. Ct. App. 1981) (holding the court's intent in dissolution decree that required parties to hold home in joint tenancy trumped joint tenant's attempt to quitclaim his interest to family and sever the joint tenancy, as quitclaim deed was a nullity in light of decree); *cf. Hockett v. Larson*, 742 F.2d 1123, 1125–26 (8th Cir. 1984) (declaring a deed partially valid, and holding that the transfer under the valid part of the deed effectively severed the joint interest, but the attempted transfer under the invalid part of the deed could not work a severance). *But see In re Baumann*, 247 Cal. Rptr. 532, 536–37 (Cal. Ct. App. 1988) (holding

---

merely created a tenancy in common and did not jeopardize the purposes behind the homestead statute. The district court also found a contrary conclusion would have the effect of creating a tenancy in the entirety, a form of ownership we have refused to recognize in prior cases. *See, e.g., Fay*, 201 Iowa at 1294, 207 N.W. at 370-71; *see also* 13 Iowa Practice: Probate § 13:111, at 741 (2006) ("In Iowa, tenancy by the entirety is not recognized."). These are questions we need not decide because the deed executed by Roy did not express an intent for the joint tenancy to be severed.

a quitclaim deed was void as it related to a third-party creditor because the joint tenant grantor fraudulently attempted to protect the property from his creditors, but that it nevertheless severed the joint tenancy between the joint tenants). We also find support for the proposition that an attempted conveyance by a void instrument, not necessarily a void deed, will not sever the joint tenancy despite an intent to do so. *See Hayes*, 338 N.E.2d at 105–07 (holding that invalid transfers of stock in joint tenancy and other indications that joint tenant wished to depart with property in joint tenancy did not sever joint tenancy).

The requirement for the intent under an intent-based analysis to be derived from a valid deed or similar instrument adds symmetry to the law and is consistent with our general principles governing property rights. In particular, we have never allowed a tenancy of any kind to be created without a valid deed or similar instrument. The same should hold true for the severance of a joint tenancy. *See, e.g., Bates*, 492 N.W.2d at 707 (permitting a severance under a valid but unexecuted mutual agreement); *Hendrickson*, 161 N.W.2d at 691 (permitting a "duly executed Declaration of Election to Sever Survivorship of Joint Tenancy" to sever the joint tenancy).[12]

**V. Conclusion.**

In the final analysis, we think the circumstances of this case do not support a conclusion that the joint tenancy was severed. Not only was Roy's intent not aligned with the objective his estate seeks to accomplish in this proceeding, but it was accompanied by a void deed

---

[12]In addition, such an agreement or instrument should be recorded or otherwise public so as to allay the possibility of fraud. *See Knickerbocker*, 912 P.2d at 976 (noting "an unrecorded and unwitnessed unilateral transaction may allow one joint tenant to defraud the other").

concerning homestead property. The district court erroneously determined the joint tenancy was severed. As a result, the property remained in joint tenancy, and Emogene's right of survivorship took effect upon Roy's death. The property should now be distributed in accordance with Emogene's will. We remand this case to the district court for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**