# IN THE COURT OF APPEALS OF IOWA

No. 21-1831
Filed March 29, 2023

**WALMART, INC., and WAL-MART REAL ESTATE BUSINESS TRUST,**
    Plaintiffs-Appellants,

**vs.**

**DALLAS COUNTY BOARD OF REVIEW,**
    Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Dallas County, Randy V. Hefner, Judge.

        A taxpayer appeals the district court ruling upholding a board of review's property tax assessment. **AFFIRMED.**

        Paul D. Burns, Matthew G. Barnd, and Paul J. Esker of Bradley & Riley PC, Iowa City, for appellants.

        Brett Ryan of Watson & Ryan, PLC, Council Bluffs, for appellee.

        Heard by Bower, C.J., and Badding and Buller, JJ.

**BADDING, Judge.**

Benjamin Franklin once famously said that "in this world, nothing is certain except death and taxes."[1]  But in the world of property tax assessments, not even taxes are certain.  *See Wellmark, Inc. v. Polk Cnty. Bd. of Rev.*, 875 N.W.2d 667, 672 (Iowa 2016) ("The valuation of property has never been an exact science. . . . Although valuation for tax purposes is necessarily expressed in quantitative terms, the appraisal process has never been and is not now a mathematical exercise.").

Walmart, Inc., and Wal-Mart Real Estate Business Trust (collectively "Walmart") appeal the district court's ruling upholding the Dallas County Board of Review's ("Board") 2019 property tax assessment.  Walmart challenges the district court's determination that a prior assessment appeal resulted in a presumptive value, asserts the appraisal from the Board's expert was not reliable evidence of value, and challenges the court's analysis of what constitutes comparable sales.

## I.    Background Facts and Proceedings

The 2019 property assessment at issue concerns Walmart's 19.1 acre site located at 6365 Stagecoach Drive, West Des Moines, on which sits a 216,511 square-foot "Big Box" Walmart.

*Prior assessments.*   Walmart protested the January 1, 2015 and 2016 assessments valuing this same property at $18,851,560.  The Board denied the protests, and Walmart appealed to the Property Assessment Appeal Board

---

[1] Franklin penned this phrase in a letter to Jean Baptiste LeRoy in November 13, 1789, although "at least two earlier references appear in literature, that of Christopher Bullock, *The Cobler of Preston*, 1716 ('Tis impossible to be sure of anything but Death and Taxes.'), and of Edward Ward, *The Dancing Devils*, 1724 ('Death and Taxes, they are certain.')."  *Delaware Cnty. v. Fed. Hous. Fin. Agency*, No. 12-4554, 2013 WL 1234221, at *3 n.3 (E.D. Penn. Mar. 26, 2013).

("PAAB"). The PAAB affirmed the Board's assessment and Walmart then sought judicial review in the district court. The district court upheld the assessment on September 21, 2018. We are unaware of any appeal from that ruling.

The tax assessment for January 1, 2017, was $19,940,370, which carried through to 2018. Walmart did not appeal this assessment.

*Assessment at issue.* The January 1, 2019 tax assessment for the subject property is $19,940,370, unchanged from the prior two years. Walmart's appeal to the Board challenged the assessment as excessive, asserting the value should be set at $17,946,333; the Board upheld the assessment. Walmart sought de novo review in the district court under Iowa Code section 441.38(3) (2019).

After trial, the district court adopted the Board's argument that under *Metropolitan Jacobson Development Venture v. Board of Review*, 524 N.W.2d 189, 192 (Iowa 1994), an evidentiary presumption applied to the 2015 and 2016 valuations of $18,851,560:

> [T]he PAAB administrative ruling adjudicating the value of this property as of January 1, 2016 creates the same presumption as a district court ruling addressing the same issue following a de novo trial.[2] If not conclusive as to the earlier value, the PAAB ruling is entitled to evidentiary weight.

The court then analyzed the appraisal evidence. Walmart presented the appraisals and testimony of Chris Jenkins of CBRE Evaluation & Advisory Services

---

[2] On appeal, the Board notes that it is "not advocating for a ruling of the [PAAB] to carry such a presumption." Instead, according to the Board, it is the value set by the district court in the administrative appeal from the PAAB decision that is entitled to the presumption under *Metropolitan*. The district court clarified that point in its ruling on Walmart's motion to reconsider, enlarge, or amend: "I do believe that the earlier PAAB ruling, as affirmed by the district court, is entitled to the same presumption as afforded to a district court de novo review of an appeal taken directly to district court."

and Gerald Maier of Mainland Valuation Services. The Board presented the testimony of Dallas County Deputy Assessor Brian Arnold and the appraisal and testimony of Mark Kenney of American Valuation Group.

This table sets out the valuations of each expert appraiser under the methods of valuation and their reconciliations of the different approaches:

|  | Jenkins | Maier | Kenney |
|---|---|---|---|
| **Comparable Sales** | $13,900,000 | $12,990,000 | $24,800,000 |
| **Income** | N/A | $12,800,000 | $21,000,000 |
| **Cost** | N/A | $13,290,000 | $20,500,000 |
| **Reconciliation/Final** | $13,900,000 | $12,950,000 | $22,400,000 |

At trial, and in its post-trial brief, Walmart argued Kenney's appraisal is flawed because he included sales of properties subject to long-term leases without making "adjustments to subtract the substantial value those leases added to the sales prices above and beyond the value of the real estate." The Board, on the other hand, argued Kenney's methodology has been accepted by Iowa appellate courts and follows Iowa law, which requires property be assessed consistent with its present use. It was Walmart's experts, according to the Board, who did not value the property at its present use because their comparable sales "are 'dark stores' (vacant stores, where the tenant had either failed or left the building)."

The district court sided with the Board on both points, finding first that Kenney's appraisal "appropriately adjusted each comparable sale for the rent and duration of the lease" and second that Walmart's experts should not have used vacant properties as comparables. In the end, the court concluded:

> Kenney's appraisal is more credible than the other appraisals. First, Kenney's estimate of value is consistent with the 2017 PAAB ruling. The 2019 assessment is less than 6% greater than the 2016 assessment, a less than 2% per year increase. Second, there is no evidence that this property has decreased in value since January 1,

2016, particularly to the extent urged by Walmart. Rather the evidence supports the conclusion that the value of this property increased between that date and January 1, 2019, at least to the extent the Board contends. Third, Kenney's appraisal is consistent with Iowa law requiring valuation of property based on its "current use." He does not rely on vacant property or property subject to known use restrictions.

The Board carried its burden to prove that the assessment imposed represented the actual value of the subject property, as defined in chapter 441.

. . . .

The Board's assessment of the subject property in the amount of $19,940,370 as of January 1, 2019 is affirmed.

Walmart now appeals.

## II.     Scope and Standard of Review

Our standard of review is de novo. *Wellmark*, 875 N.W.2d at 672. We give weight to the district court's fact-findings, especially with regard to witness credibility, but are not bound by them. *Soifer v. Floyd Cnty. Bd. of Rev.*, 759 N.W.2d 775, 782 (Iowa 2009).

## III.     Analysis

*Presumption.* A good chunk of Walmart's appellate brief is devoted to its disagreement with the district court as to the effect of a prior adjudication of value. This seems tangential to the actual issue presented—whether the assessed amount exceeded the property's market value. Iowa Code § 441.21(3)(b)(1). "[U]nder a de novo review we will make our own legal conclusions, as we are not bound by and give no deference to the trial court's conclusions of law." *In re Est. of Johnson*, 739 N.W.2d 493, 496 (Iowa 2007); *accord Compiano v. Bd. of Rev.*, 771 N.W.2d 392, 397 (Iowa 2009).

*General principles.* An objecting taxpayer has the burden to prove the assessor's valuation is excessive. Iowa Code § 441.21(3)(b)(1). But if the

taxpayer "offers competent evidence that the market value of the property is different than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed." *Id.* § 441.21(3)(b)(1). The district court found that Walmart presented competent evidence through its two experts "to rebut the presumption of validity, thus shifting the burden to the Board to uphold the assessment." *Nationwide Mut. Ins. Co. v. Polk Cnty. Bd. of Rev.*, 983 N.W.2d 37, 42 (Iowa 2022).

Turning then to the question of value, Iowa Code section 441.21(1) requires all taxable property to be assessed "at its actual value," meaning its "fair and reasonable market value." A property's market value is "the fair and reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property." Iowa Code § 441.21(1)(b)(1).

Section 441.21 provides two approaches for assessing a property's market value—the comparable-sales approach and the other-factors approach. *Equitable Life Ins. Co. v. Bd. of Rev.*, 281 N.W.2d 821, 823 (Iowa 1979). The comparable-sales approach is the "preferred method" of valuation and the one primarily relied on by all three experts in this case.[3] *Wellmark*, 875 N.W.2d at 679; *cf. Nationwide*,

---

[3] Jenkins testified that he only used the comparable-sales approach because that approach "readily establish[es] the value for this property." While Maier used all three traditional approaches—sales, income, and cost—he too testified that he was able to readily establish the value of the property through just the comparable-sales approach. Kenney likewise testified that he gave "primary consideration" to the comparable-sales approach, using the other two approaches as a sort of check on his estimate of value. *See Heritage Cablevision v. Bd. of Rev.*, 457 N.W.2d 594, 598 (Iowa 1990) ("The advantage of using multiple appraisal techniques lies

983 N.W.2d at 41 ("Despite the Code's preference for the sales approach, valuations using comparable sales alone are not always appropriate. When market value can't be 'readily established' using a sales approach, 'the assessor may determine the value of the property using the other uniform and recognized appraisal methods.'" (quoting Iowa Code § 441.21(2)).

*Methodology.* Despite their use of the same valuation approach, the experts differed in the method they used to select comparable sales. For the Board, Kenney only used properties subject to a long-term lease sold to a high-credit tenant, which he testified best captured the subject property's present use. *See Soifer*, 759 N.W.2d at 784 ("[P]roperty is to be valued based on its 'present use.'"); *accord Wellmark*, 875 N.W.2d at 682 (declining "to employ a use other than current use"); *Lowe's Home Ctrs., LLC v. Iowa Prop. Assessment Appeal Bd.*, No. 20-0764, 2021 WL 610105, at *4–5 (Iowa Ct. App. Feb. 17, 2021) (rejecting taxpayer's argument that property should not be valued according to its current use under the comparable-sales approach). In contrast, Maier only used vacant properties as comparables for his appraisal for Walmart, while Jenkins used a combination of leased and vacant properties. Each side contends the other's methodology is flawed.

Before getting into the specifics of their arguments, we first consider what constitutes "comparable" properties. We know from our case law that the properties need not be identical, but only similar. *Soifer*, 759 N.W.2d at 783.

---

primarily in those instances where the differing techniques lead to similar conclusions concerning market value and therefore tend to support each other."); *accord Soifer*, 759 N.W.2d at 790.

Factors to be considered include size, use, location, and character for the property, "and, with respect to the sale, its nature and timing." *Id.* "When sales of other properties are admitted, the market value of the assessed property must be adjusted to account for differences between the comparable property and the assessed property to the extent any differences would distort the market value of the assessed property in the absence of such adjustments." *Id.* The same must be done for sales that are "abnormal transactions," like "foreclosure or other forced sales." Iowa Code § 441.21(1)(b); *accord Soifer*, 759 N.W.2d at 783. "Whether other property is sufficiently similar and its sale sufficiently normal to be considered on the question of value is left to the sound discretion of the trial court." *Soifer*, 759 N.W.2d at 783.

Walmart argues Kenney's metholodogy is flawed because its store was owner-occupied and Kenney did not "remove the independent value these leases contributed to the sale prices" of the comparables. The Board responds that methodology is an appropriate way to value "the property as it was," unlike what it says is the "dark store theory of valuation" employed by Walmart's experts. *See Walmart, Inc. v. City of Davenport Iowa Bd. of Rev.*, No. 21-1018, 2023 WL 1808504, at *4 (Iowa Ct. App. Feb. 8, 2023) (describing a property with a long-term vacancy as a "dark property"). We don't need to get too far into the weeds on what looks like a hotly contested issue in the appraisal industry because neither section 441.21 nor case law prohibits the use of vacant or leased properties as comparables, so long as suitable adjustments are made to take the status of the

property into account.[4]  *See id.* at \*5–6 (collecting cases allowing both types of comparables).

*Adjustments.*  Moving on to the issue of the adjustments, "[w]here the property is subject to a lease, an appraiser may make an adjustment to reflect the effect of the lease on the value of the property."  *Id.* at \*6.  We have recognized that a long-term "lease may cloud the comparability of a sale because a buyer may be willing to pay more for a property with an advantageous lease than an identical property with a disadvantageous lease."  *Id.*; *accord Wellmark*, 875 N.W.2d at 682. Kenney conceded this point on cross-examination:

> Q. . . . So if an investor wants to buy property one in my hypothetical, with a long-term lease to a credit tenant, they're going to pay one price, and if they were going to buy the twin building next door with a short-term lease, they are going to pay a lower price? A. Yes.
> Q. We've established that.  You agree with that, right?  A. Yes.
> Q. And if the investor wants to buy the first building for a 20-year lease to Warren Buffett, and the other one is a 20-year lease to K-Mart, the investor is going to pay lower than that for that exact same building, right?  A. Yes.
> Q. So the real estate is identical.  The sale price difference is solely related to the lease; fair?  A. Well, in those terms, yes.

Walmart argues Kenney's appraisal cannot be relied on because he did not make any downward adjustments to the sale prices of his comparables to subtract the value added by the properties' leases.  Kenney's testimony on this point was equivocal.  At one point, he testified that he "backed out" the difference in sale prices because of the leases "throughout the process of adjustment."  Kenney

---

[4] We are not bound by the district court's contrary finding on the vacancy issue in our de novo review of the record.  *See Lessenger v. Lessenger*, 156 N.W.2d 845, 846 (Iowa 1968) (stating that in "an equity case in which our review of both facts and law is de novo," we do not reverse "upon such complaints as these but draw such conclusions from our review as we deem proper").

explained that he made two types of adjustments to account for the leases— "ownership interest adjustment and economic characteristics." The ownership interest adjustment accounted for above or below market rent, while the economic characteristics adjustment was to account for the value of the lease, if Kenney "thought it was warranted." But later, Kenney testified on cross-examination, "I didn't make any adjustment. I didn't think it was necessary." His report, however, does show adjustments in the economic characteristics category. For instance, his comparable sale #2 was sold with a new twenty-year lease to Mills Fleet Farm, and Kenney made a twenty percent downward adjustment in the economic characteristics category. Comparable sales #1, 4, 5, and 9 also have downward adjustments in that category. So it appears from Kenney's report that he did account for the value added by the properties' leases.

Walmart next argues that Kenney's failure to "ascertain[] basic terms of the bondable leases underlying his comparable sales" is a critical defect. But Kenney did include details about rental rates, duration, and renewal options for some sales in his comparison grid. Where those details were missing from the grid, Kenney stated they "would be in [his] work file," often from "the listing brochure." While he did not see the actual leases, or know details like whether the lease required the landlord to make capital improvements, Kenney testified that it was very uncommon to actually "see the leases for these kind of transaction" because they "all have confidentiality clauses." Walmart's own expert, Jenkins, testified that he was also missing details on some leases for the comparables that he used.

Walmart finally highlights the "factual errors and misleading inconsistencies" in Kenney's report. The first of these is Kenney's reference to a

listing for a Walmart in Chicago. The listing price as of April 2020 was $67.99 per square foot. But the next month, the property sold for $50 per square foot. While Kenney didn't use the listing price in his final sales comparison reconciliation, he also neglected to include the lower sale price in his analysis, which Walmart contends was misleading.

Walmart also points out that comparable sale #1 was for a Target and a freestanding Taco Bell in an outlot. Kenney allocated $19.2 million to the Target sale, with the rest for the Taco Bell. When asked how he came up with those numbers, Kenney could only point to a CoStar allocation for the property. That information, however, was not included in his report. Kenney was similarly unable to explain his likely use of portfolio sales for comparable sales #2, 3, and 5, though he criticized Jenkins for relying on a portfolio sale in his appraisal.[5]

More concerning are the upward adjustments Kenney made to comparable sales #3, 6, 7, 8, and 10 for leases with below market rent. He made a twenty percent upward adjustment for sales #3, 6, 7, and 10, and a thirty percent upward adjustment for sale #8. But in an appraisal that Kenney did for a Walmart store in Coralville around the same time as this one, the upward adjustments he made for these same comparables were cut in half. On cross-examination, Kenney was questioned about this discrepancy:

> Q. So when you analyzed that and adjusted the sale [for] the Dallas County case, I understand that you believed the sale price of that leased fee should be adjusted upward 20 percent to reflect what you in your opinion thought was below market rent. But when you adjusted that exact same sale in the Coralville case, you adjusted it

---

[5] Kenney explained that portfolio sales are typically "more of a business enterprise acquisition, an asset acquisition in addition to the real estate," which results in "all kind[s] of allocations going on."

up only ten percent for below market rent. Can you explain why, how it's possible those two adjustments could be different? A. Okay, hold on a second. So we're looking at sale 3 in Dallas County.

Q. And Sale 5 in the Coralville appraisal. A. Sale 5. And you're asking about the adjustments.

Q. Correct. For the below market rent. A. I see what you mean. Hmmm. I'm not sure right at the moment.

Q. Would you agree they both can't be correct. A. Yeah, I guess, yeah, that's true. Yeah.

Q. And so you're not sure as you sit here now whether that property should in your opinion be adjusted upward 20 percent or 10 percent for what you believe is below market rent? A. Well I know in this case I used 20 percent, so that's what I think is right.

When pressed, Kenny repeated, "Well that's what I have in my report here. . . . It's my opinion."

Yet, as the Board's attorney pointed out on redirect examination, if the lower adjustments from the Coralville case are used here, the adjusted sales comparable value would still be close to Kenney's final reconciled value of $22,400,000. So while these errors and inconsistencies are troubling, we do not think they invalidate Kenney's report, especially considering the errors in the appraisals for Walmart.

Those errors include Maier's use of only vacant properties and two bankrtupcy sales, with no adjustments made to account for either. *See Walmart, Inc.*, 2023 WL 1808504, at *7 (declining to consider Maier's valuation that used only vacant properties). And, like his counterpart for the Board, Jenkins could not explain some of the inconsistent adjustments that he made in his appraisal for Walmart. As the Board points out, when Jenkins valued the property in 2015 at $15,900,00—$2,000,000 more than his current appraisal—he used the sale of a Georgia Walmart with fourteen years left on the lease as a comparable. Jenkins made a twenty percent downward adjustment to account for that lease in his 2015 appraisal, which he increased to thirty-five percent in his 2019 appraisal. He could

not explain the discrepancy, other than noting the "retail Big Box market" had declined with the rise of online shopping. While that was a point all experts agreed upon, they also all agreed the area where this Walmart is located is vibrant, with a high average household income, strong population growth, and solid retail sector.

We wonder, assuming a hypothetical buyer would purchase the property and continue the current use,[6] would Walmart willingly sell this 19.1-acre parcel with a 216,000 square foot profitable store in a growing area for Maier's valuation of $12,950,000 or Jenkins' higher valuation of $13,900,000? We think not. Walmart did not contest the 2017 and 2018 assessments that exceeded that value by more than $6,000,000. *See Wellmark*, 875 N.W.2d at 683 (finding it "ironic that the taxpayer, having expended more than $150 million on its new corporate headquarters, now urges that the property is worth less than half of that amount for tax purposes.").

All this goes to show what we have repeated in several property tax assessment appeals:

> The variable utilized in the methodology as applied, selection of comparable sales, adjustments to value, and approach relied upon by all appraisers, simply reaffirms the principle that appraisal is not an exact science, is a subjective determination, and in final form, the exercise of professional judgment by highly qualified and skilled individuals who disagree.

*Gen. Elec. Co. v. Carroll Cnty. Bd. of Rev.*, No. 98-2288, 2000 WL 700265, at *6 (Iowa Ct. App. May 31, 2000) (quoting *Sears, Robuck & Co. v. Siren*, 484 N.W.2d 616, 617 (Iowa Ct. App. 1992)); *accord Walmart, Inc.*, 2023 WL 1808504, at *5.

---

[6] *Wellmark*, 875 N.W.2d at 683 ("We adopt the view of other jurisdictions that under the circumstances, value should be based on the presumed existence of a hypothetical buyer at its current use.").

The trial here, as in most similar cases, "boiled down to a battle of the experts." *La Posada Grp. LLC v. Pottawattamie Cnty. Bd. of Rev.*, 2021 WL 5913614, at *10 (Iowa Ct. App. Dec. 15, 2021). "While each expert's opinions contained flaws, 'the trial court is in a much better position to weigh[] the credibility of the witnesses than we are, and we will give weight to the trial court's decision on credibility even in a de novo review." *Id.* (quoting *Excel Corp. v. Pottawattamie Cnty. Bd. of Rev.*, 492 N.W.2d 225, 229 (Iowa Ct. App. 1992)); *accord Nationwide*, 983 N.W.2d at 38 ("Because courts reviewing challenges to valuations usually lack technical expertise in appraising commercial real estate, these types of cases often hinge on a factfinder's judgment about conflicting expert witness testimony.").

Though the question of value is far from certain given the millions of dollars separating each expert's opinion, we affirm the judgment of the district court on our de novo review of the record. *See Wellmark*, 875 N.W.2d at 683 (recognizing, "of course, that there is no science in this determination, only judgment based on the record before us").

**AFFIRMED.**