# IN THE SUPREME COURT OF IOWA

No. 18–1464

Submitted October 14, 2020—Filed June 25, 2021
Amended September 8, 2021

**TYLER DIX, JASON CATTELL, JIMMY McCANN,**
and **JULIE ELLER,**

Appellees,

vs.

**CASEY'S GENERAL STORES, INC.** and
**CASEY'S MARKETING COMPANY,**

Appellants.

---

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

Employees and employer both seek further review from court of appeals decision following bench trial asserting numerous violations of workplace drug-testing statute. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Oxley, J., delivered the opinion of the court, in which Appel, Waterman, and Mansfield, JJ., joined. McDermott, J., filed an opinion concurring in part and dissenting in part, in which Christensen, C.J., and McDonald, J., joined.

Rebecca Reif (argued) and Lindsay A. Vaught of Ahlers & Cooney, P.C., Des Moines; Ann H. Kendell and Amanda G. Jansen (until withdrawal), of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, for appellants.

David R. Albrecht (argued) and Amy R. Beck of Fiedler Law Firm, PLC, Johnston, and Matthew M. Sahag of Dickey & Campbell Law Firm, PLC, Des Moines, for appellees.

Leslie C. Behaunek of Nyemaster Goode, P.C., Des Moines, for amicus curiae Iowa Association of Business and Industry.

**OXLEY, Justice.**

Workplace drug testing is a controversial topic that pits an employer's right to a drug-free workplace against the privacy interests of its employees. Prior to 1998, private employers were statutorily precluded from testing employees without a sufficient reason for doing so. The Iowa general assembly revamped its drug-testing statute to allow suspicionless drug testing, putting in place specific requirements for carrying out an unannounced testing program. Private employers who choose to engage in workplace drug testing must comply with the detailed and comprehensive statutory scheme or face civil liability.

After Casey's amended its drug-testing policy to allow for unannounced random drug testing, its first testing endeavor ran into some snags. Three employees who tested positive and were terminated and another who failed to provide an adequate sample and was deemed to have resigned brought an action under the civil remedies provision of Iowa Code section 730.5 challenging a number of areas where they claim Casey's failed to follow statutory requirements.

This case raises significant issues under Iowa's private employer drug-testing statute, including when an employer is entitled to immunity, what it takes to comply with the statutory requirements, the meaning of "safety-sensitive positions," and the process for selecting employees for testing, among others. We affirm the district court's conclusion that two employees were improperly classified as engaged in safety-sensitive positions, so they should never have been tested and were entitled to the relief the court granted. The other two employees were not aggrieved by Casey's actions in attempting to comply with the statutory requirements, so we also affirm the district court's judgment as to those employees.

## I. Factual Background and Proceedings.

Julie Eller, Jimmy McCann, Jason Cattell, and Tyler Dix were employed by Casey's Marketing Company[1] and Casey's General Stores (collectively "Casey's") in its Ankeny headquarter distribution warehouse. Eller and McCann had each suffered workplace injuries resulting in medical restrictions, so they worked on light duty, sorting cigarette returns. Employees assigned to light duty worked within "the cage," a chain-link structure that surrounded them on all sides within the warehouse area of the facility. Dix and Cattell worked on heavy duty, operating forklifts and lifting heavy objects.

In early 2016, Casey's amended its Drug and Alcohol Testing Policy to add unannounced random testing of employees in a pool of safety-sensitive positions to its current policy. The district court found Casey's implemented the suspicionless drug-testing program based, at least in part, on concerns of suspected widespread drug use among warehouse employees. On January 26, 2016, Casey's disseminated the new policy to its employees located in the Service Warehouse, the Distribution Center Warehouse, and the Vehicle Maintenance Departments, including the employees involved in this case. All four employees signed the new policy, acknowledging they read and understood it.

The new policy adopted much of the language of Iowa Code section 730.5, including its definition of a "safety-sensitive position." Casey's treated all four employees as being in safety-sensitive positions on the basis that all employees working in a warehouse setting, regardless of their specific job description, held such positions.

---

[1]Casey's Marketing Company was the actual employer, but we follow the parties' lead and refer to the defendants collectively as "Casey's."

Casey's arranged for its first drug testing under the new policy with an outside vendor, ARCpoint Labs. On April 5, Casey's provided a list of 184 employees who were scheduled to work on April 6 between 10:00 a.m. and 2:00 p.m. to ARCpoint Labs and requested it randomly select 90% of those employees for testing. Casey's agreed to ARCpoint's suggestion that the unselected employees be placed into a pool of alternates. This resulted in 167 employees selected for testing and 17 employees selected as alternates. All four plaintiffs were on the initial randomly-selected list for testing.

The drug test took place the next day, April 6, and was administered by two Casey's employees trained to do so, though other employees without training assisted. As it turned out, every employee from the list of scheduled employees who showed up to work was tested, including all alternates, except two employees who were on the original list but overlooked due to an apparent oversight.

On the day of the test, Casey's vice president Jay Blair gathered the employees in the warehouse and announced the test. He advised them not to discuss with Casey's any prescription drugs they were taking. He further told the employees they could decline to provide a urine sample but Casey's would regard refusal to provide a sample as a resignation. Casey's did not provide a list of the drugs to be tested at this time.

Casey's used the warehouse locker rooms to gather urine samples. Employees were sent to the locker rooms in pairs, where they used the restroom stalls to provide their samples. McCann, Cattell, and Dix all provided samples. None of them testified anyone specifically invaded their privacy when they provided the samples, but there were gaps between the bathroom stalls that could be seen through, and the sides of the stalls were short enough to be seen over. All three samples tested positive:

marijuana for Dix and marijuana and amphetamines for Cattell and McCann. All three employees were subsequently fired.

Eller attempted to provide a sample but did not produce a large enough urine sample. She tried again an hour later but again did not produce a large enough sample. At this time, she left, since her shift had already ended and she had other plans. Under Casey's policy, Eller's departure constituted a refusal to take the test, and she was deemed to have voluntarily resigned.

All four employees brought actions against Casey's alleging various violations of Iowa Code section 730.5. The district court consolidated their cases and held a bench trial. Concluding that substantial compliance rather than strict compliance was the proper standard for assessing compliance with section 730.5, the district court found Casey's complied with the statute except for three specific violations: Eller and McCann should not have been included in the pool of employees subject to testing because they did not hold "safety-sensitive positions," Casey's failed to provide employees an opportunity to present information relevant to the drug test, and Casey's failed to provide the list of drugs to be tested on the day of the test. The court found Eller and McCann were fired as a result of Casey's statutory violation and awarded them damages, rejecting Casey's argument they each failed to mitigate damages. The court denied all of Cattell's and Dix's claims for relief because the founded violations did not cause their terminations.

Casey's appealed the district court's order as to Eller and McCann, and Cattell and Dix cross-appealed the district court's denial of relief. We transferred the appeal to the court of appeals, which upheld the district court's ultimate ruling. Casey's, Dix, and Cattell sought further review, which brings us here.

## II. Standard of Review.

The parties disagree about the correct standard of review. Casey's argues the standard of review is de novo. The employees argue the standard of review is for errors at law, citing *Sims v. NCI Holding Corp.*, 759 N.W.2d 333, 337 (Iowa 2009) (reviewing for errors of law in a section 730.5 case).

"[O]ur review of a decision by the district court following a bench trial depends upon the manner in which the case was tried to the court." *Carroll Airport Comm'n v. Danner*, 927 N.W.2d 635, 642 (Iowa 2019) (quoting *Collins Tr. v. Allamakee Cnty. Bd. of Supervisors*, 599 N.W.2d 460, 463 (Iowa 1999)). Where the case was "tried at law, our review is for correction of errors at law." *Id.* If the case was tried in equity, our review is de novo. *Id.*; *see also Longfellow v. Sayler*, 737 N.W.2d 148, 152 (Iowa 2007) ("The standard of review on appeal is not governed by how the clerk docketed the case, but rather by how the parties tried the case in the district court.").

"To determine a proceeding as legal or equitable, we look to the pleadings, relief sought, and nature of the case." *Hedlund v. State*, 930 N.W.2d 707, 718 (Iowa 2019) (considering the whistleblower statute in Iowa Code section 70A.28). The parties sought back pay and front pay under section 730.5, which is limited to equitable relief, *see* Iowa Code § 730.5(15)(*a*)(1) (2016) (authorizing "affirmative relief including reinstatement or hiring, with or without back pay, or any other equitable relief as the court deems appropriate"), indicating the case was tried in equity, *see Hedlund*, 930 N.W.2d at 718 (reviewing case in equity based on availability of similar relief under Iowa Code section 70A.28(5)(*a*)).

While ruling on evidentiary objections at trial is a "hallmark of a law trial," *Passehl Est. v. Passehl*, 712 N.W.2d 408, 414 n.6 (Iowa 2006)

(quoting *Sille v. Shaffer*, 297 N.W.2d 379, 381 (Iowa 1980)), the unavailability of a jury trial is considered a hallmark of an equitable action, *see Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 225–26 (Iowa 2017). Both "hallmarks" are present here. None of the plaintiffs requested a jury trial, which is consistent with our recent holding that a statutory claim under subsection (15) is the exclusive remedy for violations of section 730.5 and no jury trial is allowed. *See Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 431, 434–35 (Iowa 2019) (per curiam) (remanding for entry of judgment for employer on employee's common law wrongful discharge claim and vacation of the jury's award of damages not available under section 730.5(15)(*a*)). However, the district court also ruled on evidentiary objections throughout the trial. Nonetheless, we conclude the case was tried in equity based on the unavailability of a jury, the relief requested and ordered, and the inconsequential nature of any evidentiary rulings to this appeal. *See Passehl Est.*, 712 N.W.2d at 414 n.6 ("Where, as here, no one claims the trial court improperly excluded evidence, the trial court's ruling on objections does not prevent a de novo review."); *see also Carroll Airport Comm'n*, 927 N.W.2d at 642 (concluding case was tried in equity despite evidentiary objections by trial court).

We therefore review the case de novo, under which "[w]e give deference to the factual findings of the court but are not bound by them." *In re Est. of Johnson*, 739 N.W.2d 493, 496 (Iowa 2007). "Of course, under a de novo review we will make our own legal conclusions, as we are not bound by and give no deference to the trial court's conclusions of law." *Id.*

### III. Analysis.

The parties raise a number of issues surrounding Iowa Code section 730.5, which governs workplace drug testing of employees and potential employees. Section 730.5 is a comprehensive statute creating a detailed

scheme employers must follow in utilizing workplace drug testing. Various parts of section 730.5 are relevant to this appeal, and we start with an overview before turning to the specific provisions at issue.

Prior to 1998, private sector employers in Iowa could drug test employees as part of preemployment screening, a regularly scheduled employment physical, or on probable cause an employee was impaired on the job and specific conditions were met. *See* Iowa Code § 730.5(3), (7) (1997). Private sector employers could not "request, require, or conduct random or blanket drug testing of employees." *Id.* § 730.5(2).

In 1998, the general assembly passed House File 299, titled "An Act Concerning Drug and Alcohol Testing of Private Sector Employees and Prospective Employees and Providing Remedies and an Effective Date," replacing section 730.5 with a comprehensive ("byzantine" according to the court of appeals) workplace drug-testing scheme that now also allows private employers to conduct unannounced random drug testing. 1998 Iowa Acts ch. 1011 (codified at Iowa Code § 730.5 (1999)); *see also Ferguson*, 936 N.W.2d at 436 (identifying section 730.5 as setting public policy of the state concerning drug testing in the workplace and providing exclusive remedy for termination claims related to drug testing). We have described section 730.5 as providing "severely circumscribed conditions designed to ensure accurate testing and to protect employees from unfair and unwarranted discipline." *Harrison v. Emp. Appeal Bd.*, 659 N.W.2d 581, 588 (Iowa 2003).

**A. Whether Iowa Code Section 730.5 Requires Substantial or Strict Compliance.** The first issue we must address is how strictly to hold an employer to the statutory requirements in section 730.5 in determining whether it has violated those requirements. Section 730.5(4) states that "[a]n employer shall adhere to the requirements of this section concerning

the conduct of such testing and the use and disposition of the results of such testing." Iowa Code § 730.5(4). While we have not previously determined whether strict compliance or substantial compliance applies to the entirety of section 730.5, we have held subsection 730.5(7)(*i*)(1), requiring certain notices be provided to employees following an initial positive test, is subject to a substantial compliance standard. *See Sims*, 759 N.W.2d at 338.

Despite our holding in *Sims*, the employees here argue we should require strict compliance with the rest of section 730.5. In support, they note the frequent use of the word "shall" throughout the section. *See* Iowa Code § 4.1(30)(*a*) ("[W]henever . . . used in a statute . . . [t]he word 'shall' imposes a duty."). We rejected a strict compliance standard in *Sims* despite subsection (7)(*j*) alone using the word "shall" nine times. *See* Iowa Code § 730.5(7)(*j*). Moreover, we apply substantial compliance to many other statutory requirements with potentially serious consequences. *See, e.g.*, *State v. Weitzel*, 905 N.W.2d 397, 406 (Iowa 2017) (guilty plea colloquy); *E. Cent. Cmty. Sch. Dist. v. Miss. Bend Area Educ. Agency*, 813 N.W.2d 741, 746 (Iowa 2012) (school district reorganization); *State v. Bird*, 663 N.W.2d 860, 862 (Iowa 2003) (preliminary breath test machine calibration).

"Substantial compliance is said to be compliance in respect to essential matters necessary to assure the reasonable objectives of the statute." *Sims*, 759 N.W.2d at 338 (quoting *Superior/Ideal, Inc. v. Bd. of Rev.*, 419 N.W.2d 405, 407 (Iowa 1988)); *see also Harrison*, 659 N.W.2d at 586 ("[S]ubstantial compliance is compliance with respect to those requirements that are necessary 'to assure the reasonable objectives' of the statute are met."). Iowa Code section 730.5 seeks to protect the "employer's right to ensure a drug-free workplace" and ensure the

accuracy of drug tests used for adverse employment actions while also protecting "employees who are required to submit to drug testing." *Sims*, 759 N.W.2d at 338; *see also Harrison*, 659 N.W.2d at 586–87. Employing a substantial, rather than a strict, compliance standard strikes a proper balance between these sometimes competing purposes behind section 730.5, particularly in light of the detailed conditions placed on employers in carrying out a drug-testing program. Holding an employer liable for even the slightest technical violation of the comprehensive drug-testing scheme would defeat its purposes.

Consistent with the purposes of section 730.5 and *Sims*, we conclude that section 730.5 claims should be evaluated using a substantial compliance standard. This standard balances the interests of the employer and the employee. Thus, "if the employer's actions fall short of strict compliance, but nonetheless accomplish the important objective[s]" expressed by the particular part of section 730.5 in issue, "the employer's conduct will substantially comply with the statute." *Sims*, 759 N.W.2d at 338; *see also Weitzel*, 905 N.W.2d at 407–08 (holding substantial compliance with guilty plea colloquy required court to inform criminal defendant of "each requirement" or "each provision of rule 2.8(2)(*b*)" and concluding that "[t]he district court's outright and wholesale omission regarding the criminal penalty surcharges cannot pass the substantial compliance threshold" (first quoting *State v. Meron*, 675 N.W.2d 537, 544 (Iowa 2004))).

> "[S]ubstantial compliance" with a statute means actual compliance in respect to the substance essential to every reasonable objective of the statute. It means that a court should determine whether the statute has been followed sufficiently so as to carry out the intent for which it was adopted. Substantial compliance with a statute is not shown unless it is made to appear that the purpose of the statute is shown to have been served. What constitutes substantial

compliance with a statute is a matter depending on the facts of each particular case.

*Brown v. John Deere Waterloo Tractor Works*, 423 N.W.2d 193, 195 (Iowa 1988) (quoting *Smith v. State*, 364 So. 2d 1, 9 (Ala. Crim. App. 1978)).

**B. Whether Casey's Is Entitled to Statutory Immunity.** Before we reach the numerous ways in which the employees claim Casey's violated section 730.5, we must first address Casey's argument that regardless of any violations, subsection 730.5(11) immunizes it from liability. Subsection (11)(*a*) provides:

> A cause of action shall not arise against an employer who has established a policy and initiated a testing program in accordance with the testing and policy safeguards provided for under this section, for any of the following:
>
> > *a.* Testing or taking action based on the results of a positive drug or alcohol test result, indicating the presence of drugs or alcohol, in good faith, or on the refusal of an employee or prospective employee to submit to a drug or alcohol test.

Iowa Code § 730.5(11)(*a*). According to Casey's, once an employer establishes its drug testing policy pursuant to section 730.5 and initiates its testing program in accord with the statutory testing safeguards, an employee is barred from bringing a cause of action with respect to how a particular test is carried out whenever, in good faith, the employer takes action after an employee tests positive or refuses to submit to a test. Casey's distinguishes "initiates" from "administers," arguing that once the testing program is first put in place, Casey's is not subject to liability even if it fails to correctly administer or execute a particular test as long as its actions are based on positive test results (or a refusal to submit to testing) and are taken in good faith.

Subsection (11) must be read in conjunction with subsection (15), *see Simon Seeding & Sod, Inc. v. Dubuque Hum. Rts. Comm'n*, 895 N.W.2d

446, 461 (Iowa 2017) (noting "context is important" when construing a statute); *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 425 (Iowa 2010) ("Ambiguity may arise . . . when the provision at issue is considered in the context of the entire statute or related statutes." (quoting *Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 425 (Iowa 2002))), which expressly provides for enforcement of section 730.5 "through a civil action" and makes "[a] person who violates this section . . . liable to an aggrieved employee." Iowa Code § 730.5(15)(*a*)(1). When that civil action "alleg[es] that an employer has required or requested a drug or alcohol test in violation of this section," i.e., section 730.5, "the employer has the burden of proving that the requirements of this section [730.5] were met." *Id.* § 730.5(15)(*b*).

Casey's interpretation of the immunity provision would defeat an employee's civil action for an employer's failure to properly administer a drug test any time they return a positive test result as long as the overall program was properly initiated. It would also make significant portions of the statute superfluous, including largely gutting paragraph (*b*) of subsection (15). There would be no need for an employer to prove it met the requirements of section 730.5; it would just need to show it acted in good faith. Imagine a situation where, after an employer properly puts in place a drug-testing program, an employee tests positive after being selected for testing through a process that is clearly not random. Rather than proving, *see id.* § 730.5(15)(*b*) (burden on employer to prove no violation), it complied with the statutory requirements by engaging in a proper random sampling process to ensure all employees had an equal chance at being selected for testing, *see id.* § 730.5(1)(*l*), the employer would need only show it acted in good faith by terminating the employee based on the positive results.

The inconsistencies between subsections (11) and (15) reveal the ambiguity, so it falls on us to determine the immunity provision's true meaning. *See Sherwin-Williams Co.*, 789 N.W.2d at 427 ("[W]here an adherence to the strict letter would lead . . . to contradictory provisions, the duty of ascertaining the true meaning devolves upon the court." (quoting *Case v. Olson*, 234 Iowa 869, 872, 14 N.W.2d 717, 719 (1944))).

The district court concluded an employer loses its immunity when it violates any of the requirements of section 730.5. As noted by the court of appeals, this reasoning is circular; an employer who complies with the provisions of section 730.5 would not need immunity from a claim that it violated section 730.5. To avoid this circuity, the court of appeals concluded the immunity must be limited to protect an employer from liability for statutory violations by third parties, such as the independent testing entity or a medical review officer. While we agree that the immunity provision could cover claims premised on third-party conduct, the language of the statute reveals its protection is not so limited. *See* Iowa Code § 730.5(11)(*a*).

We conclude the immunity provided by subsection (11) does not apply to civil actions under subsection (15)(*a*) alleging the employer violated section 730.5. Rather, subsection (11) immunizes employers from causes of action other than those arising from the employer's violations of section 730.5, such as invasion of privacy or wrongful termination. This reading is supported by *Ferguson v. Exide Technologies, Inc.*, where we held that the general assembly's provision of a cause of action within the comprehensive drug-testing scheme left no room for common law wrongful discharge claims premised on violations of the same statute. *See* 936 N.W.2d at 434–35. This led us to conclude that "the civil cause of action

provided by Iowa Code section 730.5 is the exclusive remedy for a violation of section 730.5." *Id.* at 436.

For Casey's argument to make sense, the cause of action allowed in subsection (15) would exclude claims by any employee who returns a positive test result or refuses to submit to a test. Yet, by subjecting an employer to liability for affirmative relief, including reinstatement or back pay only as to "aggrieved employees," subsection (15) is designed to provide relief even when an employee is fired after returning a positive test result or refusing to submit to a test. *See, e.g., Sims*, 759 N.W.2d at 340–41 (recognizing cause of action for the employer's violation of the notice provisions by awarding costs and attorney fees even though employee's positive test was confirmed); *Tow v. Truck Country of Iowa, Inc.*, 695 N.W.2d 36, 39–40 (Iowa 2005) (affirming award of back pay for prospective employee who refused to take a retest following an inconclusive test, deemed a refusal to test, after the prospective employer violated section 730.5(6)(*b*)'s requirement that the employer pay for all testing).

Subsection 730.5(11) immunizes employers against causes of action separate from violations of section 730.5 based on drug or alcohol tests taken in good faith when the employer has "established a policy and initiated a testing program in accordance with the testing and policy safeguards provided for under this section." Iowa Code § 730.5(11). Even if an employer violates the requirements of section 730.5, it is protected from separate claims based on conduct covered by section 730.5 because the employee's remedy is limited to the express civil action allowed by subsection (15). It does not, however, immunize employers from the cause of action expressly allowed under subsection 730.5(15). Casey's is therefore not entitled to immunity from the statutory claims involved here.

**C. Whether Casey's Violated Section 730.5.** The employees in this case alleged several ways Casey's violated section 730.5. The district court found the employees proved three violations of section 730.5: (1) Casey's included non-safety-sensitive employees in the safety-sensitive pool, (2) Casey's failed to provide employees with an opportunity to present information relevant to the test, and (3) Casey's failed to provide a list of the drugs to be tested at the appropriate time. The employees also raise in their cross-appeals several problems with the selection process and the administration of the drug test. Throughout our discussion, we are mindful that "the employer has the burden of proving that the requirements of this section were met." *Id.* § 730.5(15)(*b*).

1. *Safety-sensitive positions.* The district court found that Casey's violated section 730.5 by placing Eller and McCann in the pool of safety-sensitive employees. Iowa Code section 730.5(8) allows an employer to conduct unannounced, suspicionless drug testing of employees selected from a predefined pool, identifying three types of pools the employer may use: the entire employee population at a particular work site, the entire full-time employee population at a work site, or "[a]ll employees at a particular work site who are in a pool of employees in a safety-sensitive position." *Id.* § 730.5(8)(*a*)(1)–(3).

Casey's chose to limit its unannounced drug testing program to employees in safety-sensitive positions under subsection (8)(*a*)(3). A "safety-sensitive position" means:

> a job wherein an accident could cause loss of human life, serious bodily injury, or significant property or environmental damage, including a job with duties that include immediate supervision of a person in a job that meets the requirement of this paragraph.

*Id.* § 730.5(1)(*j*). Casey's policy defined a safety-sensitive position in the same way. Casey's argues that regardless of this definition, whether an employee is in a safety-sensitive position should be decided by the employer based on its business judgment.

Using this standard, Casey's challenges the district court's conclusion that McCann and Eller were not in safety-sensitive positions. McCann's and Eller's light-duty work involved counting cigarette boxes returned by convenience stores to the warehouse and matching the number of returns to the invoices to ensure the accuracy of the returns. Their work was completed within a fenced-in area referred to as "the cage." The cage was secured and locked to protect the cigarettes from being stolen. Casey's does not argue sorting cigarette returns qualifies as safety-sensitive work. Rather, Casey's argues the location of the cage, within the greater warehouse environment where others operate heavy machinery like forklifts and employees must pass through to get to the cage, make McCann's and Eller's positions safety sensitive.

"Safety-sensitive" is a term of art that has a specialized purpose within the context of workplace drug testing. Public employers, as well as private employers following the mandate of government regulations, are subject to the constraints of the Fourth Amendment and may not conduct suspicionless drug testing of their employees absent a sufficient government interest. *See Skinner v. Ry. Lab. Exes.' Ass'n*, 489 U.S. 602, 615–16, 619, 109 S. Ct. 1402, 1412, 1414 (1989) (holding "the Government's encouragement, endorsement, and participation" in drug testing of private railroad employees pursuant to Federal Railway Act regulations implicated the Fourth Amendment and describing interest sufficient to pass constitutional muster as "special needs, beyond the normal need for law enforcement" (second quoting *Griffin v. Wisconsin*, 483

U.S. 868, 873, 107 S. Ct. 3164, 3168 (1987))).  One such compelling interest allows a government employer to conduct random drug tests of employees who hold "safety sensitive" positions.  *Id.* at 629, 109 S. Ct. at 1419.

In the public-sector context, "the validity of the testing depends on the degree to which the testing is essential to ensure public safety." 1 Mark A. Rothstein et al., *Employment Law* § 1:35 (6th ed. 2019). Random drug testing is allowed to address the public safety concern raised when employees use drugs or alcohol at work.  While a public employer has an interest in preventing all employees from using alcohol or drugs at work, it is only when an employee performs the type of job that such use could harm others or cause substantial property damage that a public employer is justified in conducting suspicionless drug tests.  This type of position is referred to as a "safety-sensitive position."  *See Skinner*, 489 U.S. at 621, 109 S. Ct. at 1415 ("This governmental interest in ensuring the safety of the traveling public and of the employees themselves plainly justifies prohibiting covered employees from using alcohol or drugs on duty, or while subject to being called for duty.").  Allowing drug testing of those in safety-sensitive positions strikes a balance between the privacy interests of the employee and the safety interests of the employer.

The Department of Transportation (DOT) has developed extensive regulations requiring random drug testing of employees in safety-sensitive positions in specific industries subject to DOT authority.  *See* 49 C.F.R. §§ 40.1–.413.  In determining which employees fall within the safety-sensitive mandatory testing, job titles are not important.  "[P]eople are chosen for testing based on their job *function* (known as a safety-sensitive function) not their occupational title."  Off. of Drug & Alcohol Pol'y & Compliance, U.S. Dep't of Transp., *Best Practices for DOT Random Drug*

*and Alcohol Testing* 2, https://www.transportation.gov/odapc/best-practices-dot-random-drug-and-alcohol-testing [https://perma.cc/5FRN-JTT2]; *see also* 49 C.F.R. § 655.4 (defining "safety-sensitive function" for purposes of mass public transportation to include operating, controlling the dispatch or movement of, or maintaining a service vehicle or carrying a firearm for security purposes). "Though an employer may use its own terminology to describe job categories, it is the actual performance of any of the functions listed under the definition of 'safety-sensitive function' which determines if an employee is safety-sensitive and therefore a FTA-covered employee." 1 David Evans, *Drug Testing Law, Technology & Practice* § 4:93 Westlaw (database updated May 2021).

Courts that have considered whether a position was "safety sensitive" for purposes of satisfying Fourth Amendment or statutory protections likewise focus on the specific requirements of the job rather than on the environment within which the employee works. Many courts use the standard set in *Skinner v. Railway Labor Executives' Ass'n*, where the Supreme Court described railroad employees who operate locomotives as "discharg[ing] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." 489 U.S. at 628–29, 109 S. Ct. at 1419–20; *see also, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 671, 677, 109 S. Ct. 1384, 1393, 1397 (1989) (allowing random testing for U.S. Customs' employees required to carry a firearm because they "plainly" meet the *Skinner* standard). Courts focus on the employee's specific job functions in determining the risk of harm posed by an employee using drugs or alcohol on the job. *See Bryant v. City of Monroe*, 593 F. App'x 291, 297 (5th Cir. 2014) (concluding "driving City vehicles and transporting co-workers, operating heavy groundskeeping equipment, handling pesticides, and

working in high-risk areas such as highway medians" were safety-sensitive tasks as a matter of law); *Int'l Brotherhood of Elec. Workers, Loc. 1245 v. U.S. Nuclear Regul. Comm'n*, 966 F.2d 521, 526 (9th Cir. 1992) ("In the case of the warehouse employees [in a nuclear plant], from the record before us, it appears many are engaged in work that is sufficiently safety sensitive to warrant upholding the NRC's denial of an exemption. These employees apparently actually handle safety-sensitive material and often enter the vital areas of the plant to make deliveries."); *Nat'l Fed'n of Fed. Emps. v. Cheney*, 884 F.2d 603, 610, 614 (D.C. Cir. 1989) (holding it was "readily apparent that the Army has a compelling safety interest in ensuring that the approximately 2,800 civilians who fly and service its airplanes and helicopters are not impaired by drugs" but testing of civilian laboratory workers conducting the drug testing program where "a drug-related lapse by such an employee does not portend either direct or irreparable harm, as would, for example, a lapse by an air traffic controller, pilot, or guard"); *Krieg v. Seybold*, 427 F. Supp. 2d 842, 857 (N.D. Ind. 2006) (holding "operating large vehicles and heavy equipment in areas open to the general public and co-workers" placed city sanitation workers in safety-sensitive positions); *see also Chandler v. Miller*, 520 U.S. 305, 321–22, 117 S. Ct. 1295, 1305 (1997) (invalidating Georgia law authorizing random drug tests of elected officials in part because "those officials typically do not perform high-risk, safety-sensitive *tasks*" (emphasis added)).

While nongovernment mandated drug testing by private employers is not subject to Fourth Amendment constraints, we do not ignore, nor do we believe the general assembly ignored, the specialized meaning "safety sensitive" has developed in the context of workplace drug testing in considering its meaning under Iowa law. *See Air Wis. Airlines Corp. v.*

*Hoeper*, 571 U.S. 237, 248, 134 S. Ct. 852, 861–62 (2014) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." (alteration in original) (quoting *FAA v. Cooper,* 566 U.S. 284, 292, 132 S. Ct. 1441, 1449 (2012))). Many private employers, like Casey's, have some employees who are covered by DOT requirements and others who are not, which makes consistent application of terminology with federal regulations all the more relevant.[2]

The only purpose "safety sensitive" serves in section 730.5 is to provide an option for employers in selecting the pool of employees subject to unannounced drug testing. An employer may use three different types of pools: all employees at a work site, all full-time employees at a work site, or all employees in a safety-sensitive position at a work site—a smaller pool of employees who pose a particular kind of risk. *See* Iowa Code § 730.5(8)(*a*). These options offer flexibility to employers like Casey's, which have worksites where some employees work in dangerous jobs but other employees do not. Rather than subjecting all employees (or all fulltime employees) at a work site to testing, employers may limit their unannounced, random drug testing to employees in positions the employer is most concerned about causing serious injuries or significant property damage if found to be using drugs or alcohol on the job while exempting others, such as office employees, who do not pose the same risks. Within this statutory scheme, the definition of "safety sensitive" is comparable to the meaning used by the Supreme Court in the context of

---

[2]Casey's drug policy at issue in this case has separate provisions for random drug testing of its CDL Drivers, required to be tested in compliance with DOT regulations, and "Non-DOT" drug and alcohol testing, at issue here.

public employers. *Compare id.* § 730.5(1)(*j*) ("[A] job wherein an accident could cause loss of human life, serious bodily injury, or significant property or environmental damage, including a job with duties that include immediate supervision of a person in a job that meets the requirement of this paragraph."), *with Skinner,* 489 U.S. at 628, 109 S. Ct. at 1419 ("Employees [in safety-sensitive positions] discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."). As one court has observed,

> For an employee to occupy a truly safety sensitive position, it is not enough to show that the employee has *some* interest or role in safety. Rather, the [employer] must demonstrate that the employee's position is one that in the ordinary course of its job performance carries a concrete risk of massive property damage, personal injury or death.

*Am. Fed'n of Tchrs.-W. Va., AFL–CIO v. Kanawha Cnty. Bd. of Educ.*, 592 F. Supp. 2d 883, 902 (S.D.W. Va. 2009). These cases make clear that "safety sensitive" serves a specialized purpose in the context of workplace drug testing. It identifies employees who, if performing their job functions while under the influence of drugs or alcohol, could pose such a risk of harm to people or damage to property that subjecting them to suspicionless drug testing is justified by the government's interest in protecting public safety.

Casey's could easily have chosen to apply its unannounced random drug testing program to all employees in the Distribution Center warehouse work site, but it chose to limit its program to those in safety-sensitive positions. While the employer designates which employees are in safety-sensitive positions, *see* Iowa Code § 730.5(9)(*f*), the employer may only designate employees that meet the statutory definition: "a job wherein an accident could cause loss of human life, serious bodily injury, or

significant property or environmental damage," *id.* § 730.5(1)(*j*). This definition sets the level of dangerousness, i.e., only an accident that could cause serious bodily injury or death or significant property or environmental damage. It does not eliminate the context in which the definition is applied: identifying jobs that create safety concerns if the employee was using drugs or alcohol while performing the job. If the employer had carte blanche to identify which positions it chose to designate as "safety sensitive," the employer could easily engage in the very targeting the complex statute was intended to avoid, *see id.* § 730.5(14)(*a*), by placing only certain employees in the pool. Consistent with the understanding of "safety sensitive" in the context of workplace drug tests, employers must base their designations on the functions of the job an intoxicated person could be performing that would lead to the type of serious accident identified, not just the environment in which the job is performed.

Casey's designated Eller and McCann as performing safety-sensitive positions because their jobs were located in the warehouse (within the confines of the chain-link cage), which it considers a dangerous environment based on the use of heavy equipment outside of the cage. While we do not disagree that employers likely know best which of their positions are safety sensitive, Casey's improperly focused on the environment in which a job is performed rather than the job functions in making that determination. Casey's does not dispute that the specific functions of Eller's and McCann's light-duty jobs sorting cigarettes were unlikely to lead to accidents causing serious bodily injury or significant property damage if performed while under the influence of drugs or alcohol.

Eller and McCann were misclassified by Casey's as safety-sensitive employees as defined in section 730.5(1)(*j*), and the district court properly concluded they should not have been included in the pool subjected to drug testing. Eller and McCann were aggrieved by losing their jobs because they should never have been tested. *See id.* § 730.5(15)(*a*)(1).

2. *Selection process.* The employees challenge two aspects of the selection process Casey's used to determine which employees would be tested. First, all employees not selected as part of the 90% random selection were placed on an alternate list. Second, the list used to make the random selection included a number of employees not scheduled to be at work, which resulted in Casey's testing all individuals from the alternate list who showed up for work. These interrelated challenges address two different statutory requirements: (1) identification of the pool from which employees were selected for testing, *see id.* § 730.5(8)(*a*)(3), and (2) use of a "random selection process," *see id.* § 730.5(1)(*l*).

We start with Casey's process for selecting which employees to test. Subsection (8)(*a*)(3) defines the testing pool as "[a]ll employees . . . who are scheduled to be at work at the time testing is conducted." *Id.* § 730.5(8)(*a*)(3). The employees allege Casey's improperly (1) included twenty-seven employees not scheduled to be at work, (2) excluded two warehouse employees from the testing pool who should have been included, and (3) excluded two management-level employees who frequented the warehouse. The selection requirements are aimed at preventing employers from targeting or exempting specific employees for drug tests. *See id.* § 730.5(14)(*a*) (imposing a civil penalty of $1000 for improperly targeting or exempting employees from drug tests). With this purpose in mind, we consider Casey's selection process.

The district court found that Casey's provided a list of 184 employees scheduled to work on April 6 between 10:00 a.m. and 2:00 p.m. to ARCpoint and requested it randomly select 90% of the names to be tested. ARCpoint returned a list of 167 names selected at random, and it placed the remaining 17 names on a list of alternates to be used if employees on the initial list were not at work. Ultimately, 145 employees were tested. The original list of 184 names included 21 employees who had either switched shifts with others or were otherwise approved for leave between the time the list was generated and it was sent to ARCpoint on April 5 for its selection process. Another six employees on the list were scheduled to work but either called in sick, went home sick before the test was announced, or were "no shows" on April 6. The list was also missing employees. Two employees were inadvertently left off the list though scheduled to work, and two management-level employees, as well as an unidentified number of human resource employees, were excluded from the list based on Casey's view they were not part of the Distribution Center work site.

The district court found that while the selection process was not perfect, it substantially complied with the selection criteria in subsection (8)(*a*)(3). The court found that Casey's made reasonable efforts to identify employees scheduled to work on April 6 but that the list had to be modified due to ordinary changes in work schedules, changes contemplated by the statute. *See id.* § 730.5(8)(*a*)(3) (excluding from the pool employees not scheduled to work at the time of the testing and employees excused from work under the company's normal policies prior to the time the testing was announced to employees).

With respect to providing an accurate list of employees scheduled to work on the day of testing, we agree with the district court that substantial

compliance allows some give in compiling the list for the selection process, particularly for employees who missed work the day of testing for illness or as no shows. To hold Casey's violated the pooling requirement by including those six individuals on the list would make it nearly impossible for any employer to comply with pooling requirements from a practical standpoint. The same is true for the two employees inadvertently excluded from the list. An employer is allowed some room for human error.

The employees' challenge to Casey's exclusion of Jay Blair (Vice President of Transportation and Distribution), Ed Vaske (Director of Grocery Distribution), and unidentified human resource personnel also fails as none of them were considered employees of the "particular work site" that comprised the pool of employees to be tested, *id.* § 730.5(8)(*a*)(3), identified as the Distribution Center warehouse. Even though Mr. Blair and the human resource employees regularly walked through the warehouse, their offices were in the corporate headquarters, which was treated as a separate work site for purposes of Casey's drug-testing policy. Plaintiffs do not challenge what constitutes a "work site" or what determines whether an employee whose job takes them to more than one work site is an employee of a particular work site.

Although Mr. Vaske was the immediate supervisor of Bill Brauer, the Distribution Center warehouse manager, section 730.5(1)(*j*) only includes the immediate supervisor of persons whose jobs meet the definition of a "safety sensitive position." Mr. Brauer was included in the pool because his office was located in the warehouse. Based on our clarification of what it means to hold a safety-sensitive position, he likely would not have met that definition, but he was nonetheless properly included as the immediate supervisor of the warehouse employees, i.e., the employees whose positions were in fact safety sensitive. *See id.*

§ 730.5(1)(*j*) (" 'Safety-sensitive position' means a job wherein an accident could cause loss of human life, serious bodily injury, or significant property or environmental damage, including a job with duties that include immediate supervision of a person in a job that meets the requirement of this paragraph."). The "immediate supervision" language in section 730.5(1)(*j*) limits the requirement to move up the supervision ladder only one rung, and Mr. Vaske was properly excluded from the pool on that basis. Casey's substantially complied with section 730.5(8)(*a*)(3) when it excluded these challenged employees from the pool.

With respect to the twenty-one employees who were previously, but no longer, scheduled to work at the time of testing, the issue is a matter of timing. At the time these employees were placed on the original list, they were "scheduled to be at work at the time testing is conducted." *Id.* § 730.5(8)(*a*)(3). Casey's Director of Human Resources testified she obtained the schedules from warehouse supervisors who were themselves included in the pool of employees to be tested, so she had to be discreet because she could not disclose the purpose for her request. *See id.* § 730.5(1)(*l*) (defining unannounced drug test as one conducted without advanced notice to employees subject to testing). In the time between gathering the schedules to compile the list and providing that list to ARCpoint to conduct the random selection of employees to test, twenty-one employees either switched shifts with other employees or were approved for leave. The statutory requirement to use an "entity independent from the employer" to make the selection, *id.* § 730.5(1)(*l*), means there will necessarily be some amount of time between compiling the list of employees scheduled to be at work and actually selecting the employees to test. Given Casey's explanation, and the relatively short time

period[3] between compiling the list and providing it to ARCpoint to make the selection, we agree with the district court that Casey's substantially complied with identifying employees scheduled to be at work to include on the selection list even though the list was not completely accurate. Requiring the employer to start the compiling process over each time an employee made a shift change up to the time of testing would make the process nearly impossible to complete.

We turn now to the employees' challenge to Casey's use of an alternate list, which resulted in Casey's testing essentially all employees from the original list who showed up for work, as violating the requirement to use a "random selection process." An unannounced drug test is defined as one:

> conducted on a periodic basis, without advance notice of the test to employees, . . . and without individualized suspicion. The selection of employees to be tested from the pool of employees subject to testing shall be done based on a neutral and objective selection process by an entity independent from the employer and shall be made by a computer-based random number generator . . . in which each member of the employee population subject to testing has an equal chance of selection for initial testing, regardless of whether the employee has been selected or tested previously. The random selection process shall be conducted through a computer program that records each selection attempt by date, time, and employee number.

*Id.* § 730.5(1)(*l*). The employees argue use of an alternate list violated the requirement that the selection of employees to be tested "be done based

---

[3]On our de novo review of the record, it appears Casey's compiled the original list on March 31, three business days prior to providing the list to ARCpoint on April 5, and four before the actual testing. We do not decide how long of a time period between compiling the list and conducting the selection would result in an employer not being in substantial compliance with the requirement to limit the pool of employees to those scheduled to be at work at the time of testing. Obviously, the greater the time period, particularly with no justification, the less likely an employer could be said to be in substantial compliance. Likewise, evidence that an employer compiled its list knowing that work schedules would change significantly before the time of testing could impact the substantial compliance analysis. No such evidence was presented here.

on a neutral and objective selection process . . . in which each member of the employee population subject to testing has an equal chance of selection." *Id.*

We do not decide whether Casey's use of alternates violated the statutory requirement to utilize a random selection process[4] because Dix and Cattell were not on the alternate list. Section 730.5(15)(*a*) only makes the employer "liable to an *aggrieved* employee." *Id.* § 730.5(15)(*a*)(1) (emphasis added). Thus, not every violation results in liability. Determining whether an employee is aggrieved necessarily depends on the nature of the violation. *See Sims*, 759 N.W.2d at 340–41 (holding employee was not aggrieved by loss of employment from delayed notice of rights to confirmatory testing where testing ultimately confirmed positive results but was entitled to recover attorney fees and costs where lawsuit was required to compel employer's compliance with notice requirements). Here, the plaintiffs were on the original list, so they would have been tested regardless of Casey's use of an alternate list. They were therefore not aggrieved by Casey's use of alternates.

3. *Opportunity to provide information related to the drugs to be tested.* The district court concluded Casey's failed to substantially comply with section 730.5 with respect to "the opportunity for employees to provide relevant information and the requirement that a list of the drugs to be tested for be provided to the employees being tested." Both of those findings relate to section 730.5(7)(*c*)(2), which provides:

---

[4]We reject the employees' related argument that the web-based program, www.randomizer.org, ARCpoint Labs used to select employees was not "a computer-based random number generator," Iowa Code § 730.5(1)(*l*), because it is described as a "pseudo random number generator" rather than a pure random number generator. The employees fail to explain how the pseudo random generator differs functionally from a true random number generator or created a likelihood that certain employees had a higher chance of selection or exclusion than others. A pseudo-random number generator is, for the purposes of the statute, random.

> An employee or prospective employee shall be provided an opportunity to provide any information which may be considered relevant to the test, including identification of prescription or nonprescription drugs currently or recently used, or other relevant medical information. To assist an employee or prospective employee in providing the information described in this subparagraph, the employer shall provide an employee or prospective employee with a list of the drugs to be tested.

Iowa Code § 730.5(7)(*c*)(2). Casey's forbade the employees from disclosing any personal medical information at the time of the testing. However, each employee who tested positive, including the plaintiffs, was given the opportunity to provide information to the medical review officer (MRO) who confirmed their results.

The first half of Iowa Code section 730.5(7)(*c*)(2) uses passive language—"[a]n employee or prospective employee *shall be provided an opportunity*"—while the second half is directed at the employer—"the *employer shall provide.*" (Emphases added.) This language indicates it is not necessarily the employer to whom the employee must be given the opportunity to provide information. Likewise, the statute does not include a timing requirement for making that opportunity available, and it is reasonable that making that opportunity available when, and if, the MRO contacts the employee about a positive result satisfies the requirement. Allowing the employee to provide the information to the MRO comports with the rest of section 730.5. The MRO needs the information to perform his duties of interpreting a positive result prior to providing the result to the employer. *See id.* §§ 730.5(1)(*g*) (requiring MRO to have "appropriate medical training to interpret and evaluate an individual's confirmed positive test result together with the individual's medical history and any other relevant biomedical information"), (7)(*h*) ("A medical review officer shall, prior to the results being reported to an employer, review and interpret any confirmed positive test results . . . to ensure . . . that any

information provided by the individual pursuant to paragraph 'c', subparagraph (2), is considered."). That happened here. Allowing employees to provide relevant medical information to the MRO satisfies the statutory requirement.

With respect to the required list of drugs to be tested, it is undisputed that Casey's did not provide the employees with a list of specific drugs on April 6. Instead, it relied on the definition of a "Drug" contained in the original notice of the drug testing policy provided to employees two-and-a-half months earlier on January 26:

> Any drug or substance defined as a controlled substance that is included in schedule I, II, III, IV, or V under the Federal Controlled Substances Act. Said substances include, but are not necessarily limited to cocaine, phencyclidine (PCP), opiates, amphetamines, marijuana, MDMA (ecstasy), and 6-acetylmorphines (6-AM).

The statute requires that "[t]o assist an employee or prospective employee in providing the information described in this subparagraph, the employer shall provide an employee or prospective employee with a list of the drugs to be tested." *Id.* § 730.5(7)(*c*)(2). By using the phrase "to be tested," the plain language of the statute makes clear the employer is required to provide information about the specific drugs to be tested with each test.

Providing a list of specific drugs to be tested assists the employees in identifying medical information that "may be considered relevant to the test, including identification of prescription or nonprescription drugs currently or recently used, or other relevant medical information." *Id.* The list provided to the employees with the original policy specifically identified amphetamines and marijuana, the only drugs any of the plaintiffs tested positive for, and allowed the plaintiffs to provide any relevant information

that would help explain any false positive results. We cannot say this was a failure to substantially comply with the statute.

With respect to the timing for providing the list, we likewise cannot say that Casey's reliance on the initial list of drugs disseminated with the original drug-testing policy failed to substantially comply with the statute, at least under the particular facts of this case. The statute does not specify when the list must be provided, but its purpose indicates it must be provided sufficiently contemporaneous to allow the selected employees to provide information about their medical history that would be relevant to the drugs to be tested. This was the first testing Casey's conducted after initiating its new unannounced drug-testing policy, and a copy of the policy—and its list of drugs—had been provided to all employees just a couple of months before the testing. Under these facts, Casey's substantially complied with the requirement to provide a list of drugs that allowed employees to provide personal information relevant to the drugs involved in the April 6 testing. *See Sims*, 759 N.W.2d at 338 (holding notice satisfied employer's obligations where it "nonetheless accomplish[ed] the important objective of providing notice to the employee of the positive test result and a meaningful opportunity to consider whether to undertake a confirmatory test").

We caution, however, that employers would be well advised to provide a list with each testing to allow employees to make informed decisions about what medical information they need to provide to help interpret any potentially positive results.

4. *Additional objections.* The employees also raise a number of miscellaneous challenges, including objections that the sample collection did not occur in a "collection facility" or meet the privacy requirements of

section 730.5(7), that Casey's employees were not properly trained, and that Casey's failed to test on a periodic basis.

While section 730.5 does not define a "collection facility," Casey's did so in its own policy where it declared testing would occur in a "Collection Facility," defined as "[a] certified collection site such as an occupational health center, a hospital or otherwise identified clinic or facility to which a prospective or current employee may be sent for a drug or alcohol test." It is undisputed the collection of samples here occurred in the men's and women's locker rooms at Casey's warehouse rather than a "collection facility" as defined in Casey's policy.

The district court acknowledged that the collection of samples in the locker rooms violated Casey's policy but noted "this only establishes a violation of the policy, not the statute." While true, a violation of the terms of an employer's policy is itself a violation of section 730.5. Iowa Code § 730.5(9)(*a*)(1) ("Drug or alcohol testing or retesting by an employer *shall be carried out within the terms of a written policy* which has been provided to every employee subject to testing, and is available for review by employees and prospective employees." (emphasis added)). Regardless of whether Casey's failure to comply with its own policy here amounts to a lack of substantial compliance, the employees have not pointed to any way this potential failure harmed, or aggrieved, them. We reject the employees' attempt to garner equitable relief for each purported violation of the testing requirements without also identifying how the violation caused them harm. General claims of harm to their privacy interests do not suffice.

The employees also argue the samples were not collected with adequate privacy. *See id.* § 730.5(7)(*a*) (requiring collection of samples to be "under sanitary conditions and with regard for the privacy of the individual" and requiring collection procedures for urine samples to

"provide for . . . a location at the collection site where . . . urination can occur in private," which has been visually inspected "to ensure that other persons are not present," which prevents "undetected access to the location" during urination, and "which provides for the ability to effectively restrict access . . . during the time the sample is provided"). Samples were provided in typical bathroom stalls. Although bathroom stalls may not meet the utmost privacy standards, they meet the essential objective of providing privacy to employees. The use of an employer's bathrooms fitted with individual stalls does not amount to a failure to substantially comply with the statute.

Additionally, we reject the employees' claim that all employees involved in the drug testing must meet the training requirements in section 730.5(9)(*h*), requiring "supervisory personnel of the employer involved with drug or alcohol testing" to attend at least two hours of initial training and one hour annually thereafter. *Id.* § 730.5(9)(*h*). It is undisputed that the supervisor in charge of the drug test and another HR employee completed this training.

We reject the employee's cramped reading of the statute that would require every employee who played a role in conducting the testing to receive the training. The remainder of subsection (9)(*h*) reveals the training is intended to assist in recognizing patterns of drug or alcohol abuse:

> The training shall include, but is not limited to, information concerning the recognition of evidence of employee alcohol and other drug abuse, the documentation and corroboration of employee alcohol and other drug abuse, and the referral of employees who abuse alcohol or other drugs to the employee assistance program or to the resource file maintained by the employer pursuant to paragraph "c", subparagraph (2).

*Id.* Failure to train employees who would have no involvement in trying to recognize patterns of drug or alcohol abuse has no effect on the objective

of this portion of the statute. Casey's did not fail to substantially comply with the statute by failing to require adequate training of the other employees assisting with the testing.

Finally, the employees argue Casey's failed to prove that it conducts testing on a periodic basis. *See id.* § 730.5(1)(*l*) (defining "[u]nannounced drug or alcohol testing" as "testing for the purposes of detecting drugs or alcohol which is *conducted on a periodic basis*" (emphasis added)). The test at issue here was Casey's first unannounced drug test. A failure to test periodically cannot be proven on the very first test.

5. *Summary of violations.* In sum, we conclude Casey's failed to substantially comply with section 730.5 by including Eller and McCann in the pool of safety-sensitive employees. With respect to the other challenges, Casey's actions in carrying out the drug-testing program either substantially complied with the statutory requirements or did not harm the plaintiffs.

The district court granted relief to Eller and McCann because they should not have been tested under Casey's testing program. Casey's appeals the amount of their respective awards, which we take up next.

**D. McCann's and Eller's Monetary Awards.** The district court awarded McCann back pay but not front pay based on the success of the truck food business he started after leaving Casey's. Casey's challenges his back pay award based on a lack of mitigation because he turned down an earlier job offer. McCann challenges the district court's conclusion that a front pay award was too speculative to support an award.

The district court awarded Eller both back pay and front pay based on evidence she was involved in an ongoing worker's compensation action related to an injury she received while working at Casey's that made it

difficult for her to find comparable work. Casey's challenges this award based on a failure to mitigate.

Section 730.5(15) allows the district court to award equitable relief, which we review for an abuse of discretion. *Id.* § 730.5(15)(*a*)(1) (providing for "affirmative relief including reinstatement or hiring, with or without back pay, or any other equitable relief as the court deems appropriate"); *see also Vaughan v. Must, Inc.*, 542 N.W.2d 533, 540 (Iowa 1996) (standard of review). "Under Iowa law, the burden of proof in asserting that a party has failed to mitigate damages is on the party asserting that claim." *Tow*, 695 N.W.2d at 40 (addressing mitigation in a section 730.5(15) claim). Mitigation is "an issue of fact for the district court to resolve." *Id.* In the context of employment discrimination cases,

> an employer can meet its burden of establishing the plaintiff failed to mitigate damages by showing (1) the availability of suitable jobs that the employee could have discovered and for which the employee was qualified, and (2) that the employee failed to seek such a position with reasonable care and diligence.

*Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 523 (Iowa 2012). A person is not obligated to accept employment that is not comparable to their previous employment, but recovery may be reduced if the person failed to mitigate their damages. *See id.* Mitigation thus turns on the reasonableness of the employee's efforts.

The district court granted McCann back pay, concluding his "efforts post-termination cannot be described as unreasonable," but denied front pay because "such an award in McCann's case on the present record would be unduly speculative and provide nothing short of an unjustified windfall to him" since he was still able-bodied and there was no showing he was unable to work. McCann withdrew his application for a job that may have been comparable to working for Casey's because of the distance

from home, the time commitment of the startup company, his daughter, and, potentially, concern over passing a drug-screening test. Instead, McCann started a food truck business, which took some time to become profitable. These are valid considerations in determining mitigation. *See id.* (holding distance between former job and potential job is a proper consideration in mitigation); *see also Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016) ("[S]elf-employment, if reasonable, counts as permissible mitigation." (quoting *Smith v. Great Am. Rests., Inc.*, 969 F.2d 430, 438 (7th Cir. 1992))); *Serricchio v. Wachovia Sec., LLC*, 606 F. Supp. 2d 256, 262–63 (D. Conn. 2009) ("[U]nder appropriate circumstances self-employment may be a proper way to mitigate earnings losses."), *aff'd*, 658 F.3d 169 (2d Cir. 2011). We agree with the district court that McCann's effort to start his food truck business was an earnest one. In contrast to *Hansard v. Pepsi-Cola Metropolitan Bottling Co.*, where the United States Court of Appeals for the Fifth Circuit concluded the employee's "flea market business was never more than a part-time enterprise," 865 F.2d 1461, 1468 (5th Cir. 1989), McCann treated the food truck business as his primary business, and Casey's failed to offer evidence indicating McCann did not dedicate appropriate efforts to starting this business, *id.* ("Further, Hansard did not approach the flea market as a business, rather he primarily gathered odds and ends from his home and sold them."). The district court properly awarded McCann back pay.

McCann separately appeals the district court's denial of front pay. Judgment was entered on August 21, 2018, over two years after McCann was terminated. McCann started earning revenue from his food truck business in June 2017, which was expected to go into full-time production by summer 2018. The business showed a net loss for 2017, its start-up year, which, in resisting Casey's failure-to-mitigate defense, McCann

argued was expected given that "expenses are highest and presence in the market is lowest" early in the business's life. The district court considered the 2017 loss in awarding McCann back pay.

"The plaintiff bears the initial burden of providing the district court 'with the essential data necessary to calculate a reasonably certain front pay award' . . . ." *Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C. Cir. 1995) (quoting *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992)). McCann calculated his annual pay from Casey's and asked for five years' worth of front pay for a total of $289,807, stating "there was no evidence that Plaintiff McCann's business will perform better financially than it has in the past, so nothing has been deducted for mitigation." The district court denied the request for front pay as "unduly speculative" and an "unjustified windfall." McCann's assertion that his business would remain unprofitable for an additional five years is inconsistent with his own testimony that he was going into full-time production and his first six months' of business, the only period of financial information provided, was unprofitable because his expenses were high and his presence in the market low at the start of his business. The district court did not abuse its discretion in concluding McCann's request for front pay was too speculative to justify an award.

The district court concluded Eller was entitled to both back pay and front pay but limited the front pay award to two years rather than five years, as Eller requested. Casey's challenges Eller's monetary awards because she failed to apply for any other jobs. According to Casey's, Eller's explanation that she could not perform other jobs precluded her from receiving any monetary awards from Casey's.

At the time of Eller's termination, she had been working for over two years in the light-duty position Casey's provided following her workplace

injuries. Eller provided evidence that the injuries left her physically unable to perform the vast majority of jobs she otherwise would have been qualified to perform but that she would have been able to continue the relatively nonlabor intensive work of sorting cigarette returns. This, combined with her age and education level, made her job prospects dim. Casey's failed to offer any contrary evidence. In these circumstances, Eller's failure to look for other work does not preclude her back pay and front pay awards. *See Tow*, 695 N.W.2d at 40 (holding employer has burden to prove failure to mitigate); *Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.*, 481 N.W.2d 510, 517 (Iowa 1992) (concluding testimony from aggrieved employee "that his future employment prospects were especially dismal for [identified] reasons" required the employer to show lack of mitigation); *see also Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 848 (Iowa 2001) ("Front pay is a 'form of relief that assumes the plaintiff would have continued in [his or her] position absent unlawful actions by the defendant.' " (alteration in original) (quoting Eileen Kuklis, Comment, *The Future of Front Pay Under the Civil Rights Act of 1991: Will it be Subject to the Damage Caps?*, 60 Alb. L. Rev. 465, 469 (1996))). The district court did not abuse its discretion in awarding Eller both back pay and front pay under section 730.5(15).

**IV. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals and affirm the district court's judgment.

**DECISION OF COURT OF APPEALS DECISION; DISTRICT COURT JUDGMENT AFFIRMED.**

Appel, Waterman, and Mansfield, JJ., join this opinion. McDermott, J., files an opinion concurring in part and dissenting in part, in which Christensen, C.J., and McDonald, J., join.

**McDERMOTT, Justice (concurring in part and dissenting in part).**

The majority, in declaring that Casey's improperly designated distribution warehouse employees Eller and McCann as having safety-sensitive positions, ventures into the role of HR director for Casey's General Stores, Inc. The majority's holding tells Casey's that it has little conception of which of its own warehouse positions come with safety risks. Never mind that these jobs were developed and filled by Casey's, in a warehouse outfitted and operated by Casey's, and thus with safety designations rooted in the familiarity and experience of Casey's. And, adding insult to injury, the majority finds Casey's in the wrong not because Casey's was too lax in failing to designate its employees having safety-sensitive roles, but too zealous. Employers in Iowa might be surprised to find that they're setting themselves up for liability by being overly vigorous in designating warehouse positions as safety sensitive in their efforts to ensure a drug-free workplace.

We start with the statute, which defines "safety-sensitive position" as

> a job wherein an accident could cause loss of human life, serious bodily injury, or significant property or environmental damage, including a job with duties that include immediate supervision of a person in a job that meets the requirement of this paragraph.

Iowa Code § 730.5(1)(*j*) (2016). The definition does not require that the particular job's *tasks* cause the harm. Instead, it refers to a job *in which an accident* could cause the harm. The majority's focus on the tasks involved in a particular job as the determining factor as to safety sensitivity, instead of evaluating more broadly whether the job is one in which an accident could cause injury or damage, narrows the focus in a manner inconsistent with the statute's language.

Against the plain language of the statute, the majority interprets "safety sensitive" as a legal "term of art" and thus seeks to define the term through its application in federal court cases primarily involving public employers and private employers required by the government to conduct drug testing. Those cases have no application here. Public employers and private employers required to conduct drug testing are constrained in conducting suspicionless drug testing under the United States Constitution's Fourth Amendment search and seizure standards. As the majority acknowledges, the validity of a suspicionless drug test under the Fourth Amendment generally depends on the degree to which the testing of the employee is essential to ensure public safety. In that constitutional context, it makes sense that the case law would focus on the employee's job-related tasks to determine how testing the particular employee affects public safety. But Casey's is a *private* employer not required to conduct drug testing of these employees, and Casey's ability to conduct drug testing is not limited to advancing only those interests sufficient to satisfy the Fourth Amendment. *See Skinner v. Ry. Lab. Exec.'s Ass'n*, 489 U.S. 602, 614, 109 S. Ct. 1402, 1411 (1989) ("[T]he Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative."). Section 730.5 recognizes this distinction and allows the private employer greater authority to designate safety-sensitive positions based on whether the position is one in which an accident could cause serious injury or property damage rather than whether the employee's particular job tasks implicate public safety. *See* Iowa Code §§ 730.5(1)(*j*), .5(9)(*f*).

Further, "[w]hen the legislature has defined words in a statute—that is, when the legislature has opted to 'act as its own lexicographer'—those definitions bind us." *State v. Coleman*, 907 N.W.2d 124, 135 (Iowa 2018).

In any interpretation of a statute, the words of the text are of paramount importance. *Bribriesco-Ledger v. Klipsch*, 957 N.W.2d 646, 650 (Iowa 2021) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012)). Had the Legislature left the term undefined, the majority's interpretation would find firmer footing. But the words of the statute—and particularly the omission of any reference to job *tasks* and the inclusion instead of jobs "wherein an accident could cause" serious injury or property loss—do not abide the majority's interpretation. Iowa Code § 730.5(1)(*l*).

In looking beyond the statute for its conclusion, the majority also misses another important feature of the statute: that designations of safety-sensitive positions generally belong to the employer. Section 730.5(9)(*f*) states that "[a]n employee of an employer who is *designated by the employer as being in a safety-sensitive position* shall be placed in only one pool of safety-sensitive employees." (Emphasis added.) If the determination of whether an employee has a safety-sensitive job is not to be made by the employer, the legislature could just as easily have deleted that portion of the sentence and stated "an employee shall be placed in only one pool of safety-sensitive employees." We interpret every word and every provision of a statute to give it effect, if possible. *Bribriesco-Ledger*, 957 N.W.2d at 650–51. Deference to an employer's designations of safety-sensitive positions isn't unlimited, but courts should avoid usurping an employer's designation decision unless the designation is so irrational that it demonstrates an intent to circumvent the statutory testing protocols. *See, e.g., Usery v. Godfrey Brake & Supply Serv., Inc.*, 545 F.2d 52, 55 (8th Cir. 1976) (considering whether corporate conduct showed intent to "circumvent important statutory purposes"); *Pertuis v. Front Roe Rests., Inc.*, 817 S.E.2d 273, 280 (S.C. 2018) (considering whether corporate

structure has been abused to circumvent a statute); *Minnelusa Co. v. Andrikopoulos*, 929 P.2d 1321, 1324 (Colo. 1996) (en banc) (considering whether corporate conduct "circumvents [the] intended purpose" of a statute protecting creditors and minority shareholders).

No grounds to interfere with Casey's designation exists in this case. Eller and McCann—the two employees that the majority finds Casey's misdesignated as having safety-sensitive positions—worked in a distribution center warehouse. Their core tasks involved processing boxes of cigarettes. They performed these tasks in an area of the warehouse enclosed by a common chain-link fence referred to as "the cage." Panels on the fence opened so pallets of cigarettes could move in and out. The cage allowed Casey's to keep cigarettes—a highly regulated controlled substance—separate from other goods stored and sorted for distribution at the warehouse. For employees to get to and from this cigarette area, they must walk through the warehouse. In doing so, they traverse areas and aisles lined with conveyor belts and trafficked with forklifts. The forklifts constantly move pallets on and off shelves, some of which rise to the ceiling. Stickers on the floor warn of forklift traffic. Employees who work in the cigarette area move through these aisles multiple times per day, including every time they start or finish a shift, use the breakroom, or use the restroom.

Despite the efforts of employers and employees to minimize risk and maximize safety in the regular operation of a warehouse, injuries and property damage nonetheless often still occur. *See* Occupational Safety & Health Admin., U.S. Dep't of Lab., OSHA 3220-10N 2004, *OSHA Pocket Guide: Worker Safety Series—Warehousing* 1 (2004), https://www.osha.gov/sites/default/files/publications/3220_Warehouse.pdf [https://perma.cc/27JM-V8Z8] (stating that "[w]arehouse operations can

present a wide variety of potential hazards for the worker" and that "[t]he fatal injury rate for the warehousing industry is higher than the national average for all industries"). And employees can still be injured by their proximity and movements in a warehouse even when they, themselves, aren't performing dangerous tasks. *See, e.g., Pella Corp. v. Marshall,* No. 14–2121, 2016 WL 1358956, at *1 (Iowa Ct. App. Apr. 6, 2016) (employee struck by forklift); *Dunlap v. Action Warehouse,* 824 N.W.2d 545, 548 (Iowa Ct. App. 2012) (warehouse employee injured by falling onto a forklift); *Gamerdinger v. Schaefer,* 603 N.W.2d 590, 592 (Iowa 1999) (nonforklift operator hit by a forklift); *Justus v. Anderson,* 400 N.W.2d 66, 67 (Iowa Ct. App. 1986) (warehouse supervisor injured by negligently-stacked boxes falling on him); *Brigdon v. Brandrup,* 267 N.W.2d 396, 398 (Iowa 1978) (en banc) (warehouse employee injured by truck); *Webber v. E. K. Larimer Hardware Co.,* 234 Iowa 1381, 1383, 15 N.W.2d 286, 287 (1944) (warehouse employee injured by steel sheets falling on him). An employee's own tasks often might bear little relevance to whether she holds "a job *wherein an accident* could cause loss of human life, serious bodily injury, or significant property or environmental damage." Iowa Code § 730.5(1)(*j*) (emphasis added).

In a distribution center environment like the one described in this case, not only could employees impaired by drugs fail to avoid injuries to themselves, but they could cause injuries to others. Casey's described potential risks to employees like Eller and McCann in the record. It isn't hard to imagine an impaired employee on the way to the breakroom ambling in front of a moving forklift. The forklift conceivably could hit the impaired employee, crash into another employee or machine in avoiding the collision with the impaired employee, or cause damage to property along the aisle. Suffice it to say that the permutations of ways impaired

people in a busy distribution center with moving conveyors and hurtling forklifts loaded with pallets could cause accidents resulting in personal injury or property damage are vast. Permitting only employees with jobs whose *duties* generally present greater risks ignores the risk created by others who necessarily interact with them in their space. *See, e.g., Knox Cnty. Educ. Ass'n v. Knox Cnty. Bd. of Educ.*, 158 F.3d 361, 378–79 (6th Cir. 1998) (finding school teacher and school administrator positions properly designated as safety sensitive since "[c]hildren, especially younger children, are active, unpredictable, and in need of constant attention and supervision" and "[e]ven momentary inattention or delay in dealing with a potentially dangerous or emergency situation could have grievous consequences").

And in this case, it would appear that—until they filed their lawsuit—neither Eller nor McCann disagreed with Casey's designation of them as safety sensitive. Almost three months before their drug test, Eller and McCann received the memorandum from Casey's human resources department sent to "All Safety Sensitive Employees" about random drug testing. The memorandum required employees to return a signed drug-testing verification form to their supervisor. Both did. The form stated: "I further understand that I may contact my immediate supervisor or the Vice President of Human Resources at the Corporate Headquarters if I have any questions with regard to these polices." If either employee doubted or disputed whether they should be considered safety-sensitive employees when they received the memorandum or submitted their signed verification form, it has escaped capture in this record.

The warehouse described in this record certainly presents a sufficiently hazardous environment for Casey's to have designated both Eller and McCann as employees with safety-sensitive positions at this

work site.  I thus respectfully dissent from the majority's holding on this issue in division III.C.1 and similarly dissent from the majority's holding in division III.D that Eller and McCann are entitled to associated monetary damages.  I join divisions III.A, III.B, III.C.2, and III.C.3 of the majority's opinion.

Christensen, C.J., and McDonald, J., join this concurrence in part and dissent in part.